BALDWIN et al. v. SMITH et al. (No. 32.)*
(Court of Civil Appeals of Texas. Beaumont. Dec. 2, 1915. Rehearing Denied Jan. 6, 1916.)

ACKNOWLEDGMENT ☞60—PROPER EXECUTION BY MARRIED WOMAN—EVIDENCE.

Where 35 years after the conveyance of land by their ancestor to a third person the heirs executed a quitclaim deed thereto to cross-complainant under which he asserted title against the successors in title of the grantee in the ancestor's deed, and, the ancestor's deed being lost, the evidence showed that he and his wife executed it before a notary public, who took their acknowledgments, that the grantors in such deed lived near the land for many years, but asserted no claim thereto, as neither did their heirs, until the execution of the quitclaim deed, such evidence was sufficient to establish title in the ancestor's remote grantee, since under the facts such evidence was sufficient to establish circumstantially that the separate acknowledgment of the ancestor's wife was properly taken as required by the statute.

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 318, 319; Dec. Dig. ☞60.]

Appeal from District Court, Liberty County; L. B. Hightower, Judge.

Action by C. N. Smith, with Ab J. Jett, and another as interveners, against Jacob C. Baldwin and others, to try title to land. Cross-bill by defendant Baldwin asking for a judgment of title in him. Judgment for plaintiff and interveners, and Baldwin appeals. Affirmed.

Baldwin & Baldwin, of Houston, for appellant. Marshall & Harrison, of Liberty, for appellees.

BROOKE, J. This is an action of trespass to try title, filed by C. N. Smith, Ab J. Jett and Jef Cochran coming in as intervening plaintiffs, against Jacob C. Baldwin, F. M. Tanner, Anna Charles, and husband, John Charles, John Crost, Eliza Dever, née Crost, and husband, Bill Dever, Grace Blocker, née Croft, and husband, and Jack Blocker, to recover 262¾ acres of land, the east half of the 525-acre tract known as subdivision No. 4 of the B. Tarkington league, in Liberty county, Tex. The land involved is described in the judgment rendered in the case. The defendant Jacob C. Baldwin filed plea of not guilty and cross-bill against the plaintiff and the interveners and his codefendants, asking judgment in his favor for the land involved. All parties defendant were duly served, and answered; Baldwin's codefendants, in effect, disclaiming any interest in the land. Baldwin was the only defendant who asserted title to the land, and the controversy was between him, the plaintiff, and the interveners. The case was tried by the court without a jury, and judgment was rendered for the interveners for the land involved, and for the plaintiff and interveners for costs of suit, to which judgment and conclusions of law and fact the defendant Jacob C. Baldwin excepted and gave notice of appeal, and the case is properly before this court.

On February 13, 1847, the state of Texas issued to B. Tarkington, who was then a married man, a patent to one league of land, located in Liberty county, Tex. He died February 13, 1861, and his wife died in August, 1865. They left several children surviving them, who partitioned the estate of their father and mother in October, 1865. In that partition the other heirs of B. Tarkington conveyed or set aside to Mary Tanner, who was the daughter of B. Tarkington, and who was at that time the wife of James R. Tanner, her share of the interest in her mother's and father's estate, which was 525 acres of said B. Tarkington league, and being subdivision No. 4, the east half of which is involved in this suit, whereby the property became her separate estate.

James R. Tanner and Mary Tanner lived together as husband and wife from the date of their marriage, which was prior to 1860. About 1880 James R. Tanner died, and some time thereafter his wife, Mary Tanner, also died. About October 12, 1870, a man by the name of Francis Hammer came into the neighborhood from the state of Ohio, and bought from some of the heirs of B. Tarkington their subdivisions of said land. On that date, according to the testimony of John L. Tarkington, he saw Mary Tanner and her husband, James R. Tanner, sign a deed to Francis Hammer by which they conveyed to him said subdivision No. 4, for a consideration of 50 cents per acre, which the grantee paid in gold. This deed was executed in the house of a man named Mel McGinnis, who lived upon the Tarkington league; that is, a party gathered there, and a justice of the peace named Evans was present. James R. Tanner and wife appeared before this justice, and, as the witness says, signed and ac-

knowledged the deed, but he does not know whether it was properly acknowledged or acknowledged as required by law, with reference to the acknowledgment of a married woman. He does not know whether any or all of the requirements of law were complied with, or whether the certificate of acknowledgment was ever placed on the deed.

The plaintiffs and interveners showed a regular chain of title from Francis Hammer down to themselves. The first deed in the chain of title, from Francis Hammer to John Lyford is dated July 15, 1875. The other deeds in plaintiff's and interveners' chain of title are dated at intervals from that date down to the one to plaintiffs and interveners, which is dated the 17th day of July, 1913. This chain of title consists of six transfers, and in each of said deeds is found a recital substantially the same as that found in the first deed from Francis Hammer to John Lyford, dated July 15, 1875, and which the court found was of record in the Deed Records of Liberty County in Book P, page 120. The recitals in all of said instruments were as follows:

"All that tract or parcel of land lying and being situated in the county of Liberty, state of Texas, and being part of the Barton Tarkington league of land originally patented to Barton Tarkington and said tract conveyed to Mary Tanner one of the heirs, by deed of partition among said heirs of Barton Tarkington, deceased, on the 20th day of October, 1865, and conveyed by said Mary Tanner, joined by her husband, James Tanner, to Francis Hammer, by deed dated the 12th day of October, 1870, and described as lot 4 in Hammer plat."

On the 25th of October, 1906, the sole and only heirs of Mary Tanner, who are the codefendants with Baldwin, conveyed said subdivision No. 4 of the B. Tarkington league, which is the land that was set aside by Mary Tanner in the partition of the estate of B. Tarkington and his wife to B. I. Sparks, who conveyed the same to Annie Lomax, who conveyed the same to Jacob C. Baldwin, and the defendant Baldwin is the legal owner of whatever title, if any, that was in Mary Tanner at the time of her death.

James R. Tanner and Mary Tanner lived near the land in question, after it is alleged that they sold the same to Francis Hammer, until about 1880, when James R. Tanner died, and Mary Tanner continued to live near the said land until the time of her death, which took place many years afterward, and no claim was ever made by either of them during their lifetime to the land in question, and no claim was made by the heirs, so far as the record shows, of Mary Tanner, until about the 25th day of October, 1906.

The court found that due diligence, search, and inquiry had been made for the deed supposed to have been executed by Mary Tanner and her husband, James R. Tanner, to Francis Hammer on the 12th day of October, 1870, and it finds that the said deed was seen by Mrs. Lincoln H. Hyer, of Los Angeles, Cal., and that the same was destroyed among her husband's papers in the year 1904, and that her husband is now dead. Therefore the court admitted the testimony of J. L. Tarkington, who testified as follows:

"I am a brother of Mary Tanner. She is dead. She married James R. Tanner, and he is dead, too. I remember when the Barton Tarkington league was partitioned. I remember seeing a deed executed by Mary Tanner and her husband, James R. Tanner, to Francis Hammer. It was at Mel McGinnis' house on Tarkington prairie in Liberty county. I was present, and I seen her and her husband sign it. Maj. Evans, they called him, took her and her husband's acknowledgment. He held the position of justice of peace. I also executed a deed there that day before Maj. Evans. I sold to Francis Hammer. I don't think any one else sold to Francis Hammer that day. I and my sister and her husband signed their deeds. It was at Mel McGinnis' house on Tarkington prairie. Maj. Evans, the justice of the peace, took the acknowledgments, and I paid him the money right there in the house for taking the acknowledgments. You ask me since that time have any of the heirs of Mary Tanner or Tarkington heirs asserted claim or claimed any part of that land, and I say I never knew of them to claim nary foot of it since that time. They haven't put up no claim at all in any way. You ask me all I know about it is they were there and executed some kind of a deed, and Maj. Evans took their acknowledgments, and I say we made the deeds to Hammer. I don't know whether he took my acknowledgment right or wrong, and don't know anything on earth about that, but he took the acknowledgment. He did not take the acknowledgments when I had a partition deed, and I don't recollect who did take the partition deed acknowledgments. You ask me how long before that it was that I had a partition of the land among the heirs, and I say, well, the land was divided up in September, 1865, and then it was sold. I don't recollect exactly how long afterwards, now; in the 70's I think. It was in September, 1865, when the league was divided up. I don't know whether Maj. Evans took any of them or not, no one else ever sold at all, any of the heirs at that time. I signed an acknowledged deed in 1865. Now, as to whether they were acknowledged then or later on, well, the county surveyor divided the league up. A. M. B. Tomkins was his name. You ask me if the deeds were acknowledged the same day I signed them or later on, and I ask you the land I sold to Hammer, and you say yes, or the deeds I made between each other between the heirs, and I say the deed was signed up between the heirs when the league was divided. You ask me if the deed was acknowledged then at that time, and I say I don't remember who did take the acknowledgments. You say let me read this acknowledgment to you and see if this is not the time I am talking about: 'State of Texas, County of Liberty. I, J. M. Evans, a justice of peace and ex officio notary public, duly elected, commissioned and sworn in and for said county, beat No. 3, do hereby certify that Wm. West, to me well known, this day says upon oath that he is well acquainted with all the parties to the within deed of conveyance, and that all signed same in his presence for the consideration therein expressed, and that himself and A. N. B. Tomkins signed the same as witnesses. Witness this, my official signature, seal of office, this 31st day of October, 1870. J. M. Evans, J. P. No. 3, L. Co.'—and you ask me if that is about the same time I spoke of, and if Mr. Evans ever took but one acknowledgment, and I say I don't recollect. You ask me if the partition deed between me and the heirs was signed by Wm. West and A. N. B. Tomkins, and I say that Wm. West was there, but he was just an agent for his sister to sell it out, and attend to his business; that is the way he came to be in it. I do not remember whether he signed as a wit-

ness or not, but he was there. That is about the same time I spoke of Maj. Evans being there. Mr. West attended to his sister's part of the business. You ask me if Maj. Evans was not there at any time except the one time, and I say he was there at McGinnis' house when I sold my part of the land and my sister sold hers, and he took the acknowledgments. Maj. Evans was there as a justice of the peace, and he was there. Mr. Hammer never bought any other interest that I know of in the league. Hammer bought my strip and my sister's strip; that is the two he bought that day. Why, certainly I saw the money passed; he paid it in gold. I sold it to him for 50 cents per acre. Mary Tanner was living with her husband at that time; they were living there together; he was there also. He signed the deed, and she signed it, and Major Evans took the acknowledgment."

The court found that on the 12th day of October, 1870, J. L. Tarkington sold his lot of the subdivision of the Barton Tarkington league of land among the heirs as set forth in the plat heretofore mentioned, and that on said date, and at the house of Mel McGinnis, J. L. Tarkington saw a deed executed by Mary Tanner and James R. Tanner, by the said Mary Tanner and James R. Tanner signing same, to Francis Hammer, and that both of said parties, that is, the said J. L. Tarkington and Mary Tanner, joined by her husband, James R. Tanner, sold their respective strips of land in said partition for the sum of 50 cents per acre, which was paid in gold by the said Francis Hammer.

He further found that one Maj. Evans, known as Judge Evans, who was a justice of the peace, took the acknowledgments of said J. L. Tarkington, and also took the acknowledgments of Mary Tanner and her husband, James R. Tanner.

The court further found that the heirs of Mary Tanner and James R. Tanner have never asserted any right, title, or claim to the land in controversy since the date of the deed to Francis Hammer.

There is only one question to be decided by this court: Did the trial court commit error in rendering judgment in this cause for the plaintiff and interveners for the land involved in this suit? In other words, the sole question to be decided is whether or not it was shown that there was a deed from Mary Tanner and her husband, James R. Tanner, to Francis Hammer conveying the land in question, and whether or not the loss of said deed was shown, and whether proof of the execution of said deed was made sufficiently to pass the title under the said deed to the said Francis Hammer. We are not unmindful of the fact that this question is full of difficulties, and that each case will depend largely upon the facts in that particular case.

In the case of Texas Land & Cattle Company v. Walker, reported in 47 Tex. Civ. App. 543, 105 S. W. 546, the facts were very similar to the instant case. The agreement, which was signed in that case by the parties, stated substantially the following, namely: That the land in controversy in said tract was inherited by Mrs. Eliza Schultze, which interest is an undivided one-fourth of said one-fourth league; that Wm. Hadden inherited one-half of said survey; that Mrs. Eliza Schultze, wife of C. A. Schultze, and Mrs. Virginia Fitzgerald, wife of J. M. Fitzgerald, inherited said survey from Wm. Hadden, each inheriting one-fourth; and that Mrs. Schultze was a married woman since 1866. The main issue in that case was whether or not Eliza Schultze and husband conveyed her one-fourth interest to her sister, Virginia Fitzgerald, and her husband, or to either of them, by deed of exchange of lands under which plaintiffs claim, that plaintiffs owned the other three-fourths interest in the tract and that plaintiffs had also acquired title of some of the heirs under Mrs. Schultze, and her one-fourth interest, the amount of land in suit being all of said one-fourth interest, except such as they had bought up from certain of Mrs. Schultze's heirs, she having died in 1898. In that case the court said:

"The question involved is whether or not a conveyance of Mrs. Eliza Schultze's one-fourth interest to the Fitzgeralds was shown by sufficient evidence. After plaintiff had concluded its proof, defendant filed the following: 'Now comes the defendant in the above entitled [and numbered] cause, and demurs to the evidence of the plaintiff, and asks that the court instruct a verdict for the defendant.'

" * * * The court directed a verdict for defendant, upon which an agreed judgment was rendered awarding to appellees the part of Mrs. Schultze's * * * interest that had not been conveyed to plaintiff by her heirs. The testimony on the disputed issue was substantially as follows: Mrs. Eliza Schultze died in 1898. Her husband * * * testified that he and his wife exchanged Mrs. Schultze's one-fourth interest in the Hadden survey with Virginia and John Fitzgerald for their interest in certain land in the Pettus league, in Wharton county, and that he and his wife never * * * asserted any interest in said Hadden survey, but went into possession of the Wharton county land, and that Schultze paid the taxes on it until he sold it; that said exchange was made under the following circumstances: That either Capt. Everett, a notary public, or Henry Wagenfuhr, county clerk of Colorado county, both of whom are now dead, or Mr. Daniels, notary of Colorado county, who is living, made out the deed of transfer of Mrs. Schultze's interest in the Hadden one-fourth league to John and Virginia Fitzgerald at either Alleyton or Columbus, or at witness' house, within a few days prior or subsequent to the acknowledgment of deed of John and Virginia Fitzgerald transferring their interest in the tract of land in Wharton county to him and his wife, Eliza. Witness, his wife, and one of said officers were present when the deed was executed. * * * The officer, one of the three named, took the acknowledgment of witness and his wife. Witness did not know what questions the officer put to his wife. He was not present with them at the time. Witness signed it, and saw his wife do so. The two deeds were written by the same party (as in the instant case). * * * A deed was placed in evidence by plaintiff as the deed given in exchange, which was from John * * * and Virginia Fitzgerald to C. A. Schultze for land in Wharton county, dated * * * October, 1879, and acknowledged before J. H. Coale, justice of peace and ex officio notary public of Gonzales county, on November 15, 1879.

This deed was to C. A. Schultze alone, and it recited that it was made 'for and in consideration of a tract of land deeded to us by C. A. Schultze, said land lying in Matagorda county.' Witness Schultze testified further that he did not remember that anybody else was present but himself, his wife, and the officer; that his wife was interested, besides, in the tract in question, in the Pettus league, in Wharton county, and the Criswell land in Matagorda county, and also certain land in the Sampson league, in Matagorda county, and "in other counties; that witness had never executed deed to his wife's property without being joined by her, except a deed to a railroad right of way to which she consented. Witness denied the fact that his wife was reluctant about alienating the property which she inherited from her father, and testified that she did not refuse to sign many deeds when witness was trying to sell same; that the deed to the land in Wharton county does not speak the truth in its recital that it was made in consideration of a deed from witness. The witness went on to say: 'The deed of transfer of my wife's interest in the Jackson Hadden one-fourth league in Matagorda county, Tex., to John and Virginia Fitzgerald was signed by my wife, Eliza, and myself. The proposition to make the transfer was gotten up between my wife and her sister, Virginia. There was but one deed made of this property during my wife's lifetime, and it was the deed to John and Virginia Fitzgerald, and I and my wife, Eliza, acknowledged said deed.' It was shown that in November, 1879, J. M. Fitzgerald conveyed one-half of the Hadden one-fourth of a league to Joseph and A. Vanham, which deed was placed of record. * * * There was sufficient proof that such a conveyance from Mr. and Mrs. Schultze to Fitzgerald could not be found, and that all reasonable search had been made for it; also proof that Everitt and Wagenfuhr were dead, and that Daniels, though living, remembered nothing of the transaction; also proof that J. M. Fitzgerald had, in the presence of his wife, been asked for such a deed, and he stated that he did not have it. There is no testimony by any person who saw such a deed as to it containing an acknowledgment of Mrs. Schultze. [So in the instant case.] Fitzgerald's and his wife's testimony was not taken, but there is nothing to suggest that their testimony at this time, if taken, would have thrown any light on whether or not it showed a proper acknowledgment, or any acknowledgment by her.

"Upon substantially this state of evidence the court took the view that there was not sufficient testimony to warrant finding that Mrs. Schultze had executed a conveyance of her interest in the Hadden land to the Fitzgeralds. The proof was direct that she and her husband signed such a deed in 1879, at or about the time of the date of the deed from the Fitzgeralds to Schultze, which was November 15, 1879. That fact the jury could, of course, find if they believed Schultze, but more was necessary, namely, that she, before a proper officer, had the instrument explained to her and made the acknowledgments which the statute requires of married women."

The court further says:

"After a long lapse of time, it cannot be expected, and the law will therefore not require, the same circumstantiality of proof as in cases where testimony of the precise transaction is * * * accessible. As was stated in the case of Parkes v. Caudle, 58 Tex. 220; 'If a deed was, in fact, * * * made and was destroyed by fire, no copy having been preserved, it would be rare, indeed, that witnesses after 20 years had passed, would be able to testify definitely to more than its substance.' In the case now before us 25 years had elapsed since the time such a deed was made, if made at all. Conditions are shown which seem to render it impossible to discover or obtain the testimony of the officer who Schultze says took his and his wife's acknowledgment to such a deed. Mrs. Schultze died in 1898. Schultze would, of course, not know what transpired between the officer and his wife in respect to her acknowledgment taken separately from him. From the time indicated for the making of such a deed Mrs. Schultze and her husband did not assert claim to the Hadden land while she lived, and presumably her heirs did not for a considerable time later; this action not being brought until 1904. Schultze and wife went into possession of the Wharton county land taken in exchange, and paid taxes upon it until it was sold. The Fitzgeralds sold the Hadden land soon after the date indicated for such exchange, and it has been regularly conveyed through successive grantees by recorded deeds, until it came to appellant; no others having asserted any claim thereto in the meantime. We do not hesitate to recognize that there are circumstances the other way, but the question before us is whether or not there are sufficient circumstances in favor of the execution of such a deed by Mrs. Schultze to require the matter to be submitted to the jury. There was direct evidence of the fact of the exchange of this land, that Schultze and his wife both signed a deed of it to Fitzgerald and wife, and that this was done before an officer qualified to take acknowledgments to deeds, and that he took the acknowledgment of both of them, and that her acknowledgment was taken out of his presence. The only fact of which direct proof is wanted is that the officer explained the deed to her, and took her acknowledgments to what the statute required. That such a proceeding is capable of being proved by circumstances where the deed is lost has been held in Simpson v. Edens, 14 Tex. Civ. App. 236, 38 S. W. 474; Daniels v. Creekmore [7 Tex. Civ. App. 573] 27 S. W. 148. After so long a time as has occurred here, in respect to the missing link of title, it would be unreasonable to exact direct circumstantial proof of each and every act that is necessary to be done before an officer in taking a married woman's acknowledgment. In this case no one would seem to be in a position to give any testimony concerning the particular act of the officer and the woman, the officer being undiscoverable, the woman being dead, and the husband excluded by law" from being present in the taking of the acknowledgment. "It is argued by appellee that plaintiff should be required [the same argument in the instant case is made] to make proof of the several acts that were essential to Mrs. Schultze's acknowledgment before it could recover. We take this to be a contention that such acts could not be inferred by the jury from circumstances developed here; further, that such a rule would open the door wide for fraud, and enable one who held such a deed with a defective certificate thereon to destroy it, and then establish a deed that had really been never executed. The answer to this argument is that such a consideration would in any case be more properly for the jury, as the courts do not proceed upon the hypothesis that men are disposed to be dishonest. Again, after a long lapse of time, the argument might well be made that the alleged grantor and her heirs, have, by their delay, rendered it necessary, in the interest of justice, to allow the grantee to establish the execution of such deed by evidences and inferences which it would not have been necessary to resort to had they asserted their right at a time when direct or better proof would have been accessible. The argument" of appellee "would leave little hope for a grantee under a proper married woman's deed, which could not be found after many years had passed. If the witness Schultze" was present at "the trade which was made by his wife, and she acknowledged the deed before a proper officer, separate and apart from him and * * * received land

in exchange, and she never afterwards claimed this land, it would not be an inadmissible ·inference, in view of these facts, for a jury to make that, if she acknowledged the deed, she did so with a full understanding of the deed, and did so willingly, and did not wish to retract it. We think that after so many years of nonclaim by Mrs. Schultze and·her heirs, and the growth of the chain of title openly exposed on the public records, that could have had a proper origin only in a conveyance by her of her title, together with what was testified to by Schultze and the apparent hopelessness of at this time proving the details and formalities of a wife's acknowledgment by any direct evidence, it should have been left the jury to say, from what was before them, whether or not she had, in fact, effected a conveyance of this property."

The court therefore reversed and remanded the cause. The reasoning of this case seems to be sound, and this case was followed and quoted with approval in the case of Wright v. Giles, 129 S. W. 1167.

Chief Justice Rainey in the case last above ·cited said:

" 'The execution and contents of a lost deed may be proved by circumstantial evidence' [citing Bounds v. Little (75 Tex. 316) 12 S. W. 1109]. The deed was made in 1862, about 45 years before this suit was brought. After so long a time the law will not require the same circumstantiality of proof as in cases where testimony of the precise transaction is supposed to be accessible [citing Cattle Co. v. Walker (47 Tex. Civ. App. 543), 105 S. W. 545, above cited]."

Continuing the court says:

"The law only demands the *best proof of a transaction that it is susceptible of, and, when that is produced, then it becomes a question whether or not its probative force is such as to establish its existence.*" (Italics ours.)

In the instant case about 35 years have ·elapsed. The testimony was that the deed from Mary Tanner and her husband, James R. Tanner, was signed by both of them, that it was acknowledged before an officer by each of them, and that the consideration was paid to them in gold. Following this transaction, the proof was that the Tanners lived near the land in question for many years, ·and that neither they, during their lifetime, nor their heirs, claimed any interest in the land until about 35 years had elapsed. In 1876 a deed was made by Francis Hammer, which recited the fact that it was the same land being conveyed as had been conveyed ·on the 12th day of October, 1870, by Mary Tanner and husband to him. All of the succeeding conveyances of this land, down to the present claimant, contain the same recitation. In 1906 the heir or heirs of Mary Tanner and James R. Tanner executed a quitclaim deed to all their right, title, and interest to lot No. 4 to B. I. Sparks, and Sparks ·conveyed to Lomax, and Lomax conveyed to Jacob C. Baldwin.

These facts were before the court who tried the case, and he found that the acknowledgments were taken by a person properly authorized to do so, of Mary Tanner and her husband, and by entering judgment upon said finding practically held that the ac-

knowledgments of Mary Tanner and her husband were taken in compliance with the law with reference to the·acknowledgments of married women. The court having passed upon the testimony and the inferences to be drawn from said testimony and the circumstances surrounding said transaction, we do not feel disposed to disturb its holding.

Therefore, upon the authority of the principle announced in the case we have quoted above, and believing that the reasoning is sound and applicable to the facts in the instant case, we hold that there was sufficient evidence adduced to pass the title, under the facts above recited, and that this cause should be in all things affirmed.

It is so ordered.