TEMPLE LUMBER CO. et al. v. PULLIAM et al. (No. 1132.)

(Court of Civil Appeals of Texas. Beaumont. April 30, 1925. Rehearing Denied May 13, 1925.)

1. **Trespass to try title ⊙⟹41(1) — Evidence held to sustain finding that tax deed to whole league in controversy was executed to plaintiffs' ancestor.**

Evidence *held* to sustain finding that sheriff and tax collector executed tax deed to plaintiffs' ancestor for whole league of land in controversy, except 350 acres, and that deed did not convey only 3,178 acres.

2. **Appeal and error ⊙⟹209(4), 719(6)—Contention not raised in trial court nor made assignment of error cannot be first made on appeal.**

Where defendants made no contention in trial court, nor assigned any error, that evidence was not sufficient to show execution of tax "deed" to plaintiffs' ancestor, but case was tried on theory that such ancestor had a tax deed to land in controversy, *held* that defendants cannot, for first time on appeal, contend that no deed to plaintiffs' ancestor has been established.

3. **Appeal and error ⊙⟹882(11)—Party requesting submission of issue to jury cannot thereafter complain of insufficiency of evidence to support jury's finding thereon.**

Where defendants requested submission of special issue as to whether tax deed to land in controversy was executed to plaintiffs' ancestor, they cannot complain of insufficiency of evidence to support jury's finding thereon.

4. **Appeal and error ⊙⟹882(11)—Litigant who, after instructed verdict is denied, requests submission of special issues cannot, on issues going against him, assign error that verdict is not supported by evidence.**

A litigant who asked for an instructed verdict, and, on its being refused, requests and has submitted special issues going to heart of case, cannot, upon jury answering requested issues against him, assign error that verdict is not supported by the evidence.

5. **Adverse possession ⊙⟹114(1) — Evidence held to sustain finding that plaintiffs' ancestor had adverse possession of land in controversy for 10 years prior to filing suit.**

In action in trespass to try title, evidence *held* to support jury's finding that plaintiffs' ancestor, in person or by his tenants, had peaceable and adverse possession of land in controversy for more than 10 years prior to filing of suit.

6. **Adverse possession ⊙⟹82—Tax deed need not be of record in order for possession to extend to boundaries contained therein.**

In order for possession and limitation in favor of one holding tax deed to league of land to be extended to boundaries contained in deed, it is not necessary that tax deed be of record, in view of Vernon's Sayles' Ann. Civ. St. 1914, art. 5676.

⊙⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**7. Landlord and tenant ☞66(2) — Grantee of one holding land as tenant holds in same capacity, and lease thereof to another does not affect landlord's title, unless brought to his notice.**

The grantee of one clearing and cultivating land as tenant of another, who holds adversely to record owner, is a tenant of such other, since he holds and uses such land in same right as original tenant, and, in order for lease to him from record owner to affect landlord's claim, tenant's repudiation of landlord's title must be brought to landlord's notice.

**8. Exceptions, bill of ☞8—Bills to exclusion of evidence, which fail to show grounds of objection, insufficient.**

Bills of exceptions to action of court in excluding offered evidence, which wholly fail to show grounds of objection that were made to evidence tendered, are insufficient, and point out no error, in view of district court rule 58.

**9. New trial ☞102(3)—New trial for newly discovered evidence held properly denied for lack of diligence.**

In motion for new trial for newly discovered evidence, where alleged newly discovered evidence of witness could have been discovered by inquiry of other persons, and it was shown that movants knew of importance of testimony and whereabouts of witness at time of trial, but made no motion for postponement of trial, and it was further shown that affidavit of witness had been in possession of movant at time original motion for new trial was filed, but was not brought to court's attention until amended motion was filed, which was then too late to afford opposing party an opportunity to meet it, *held* that new trial was properly refused for lack of diligence.

Appeal from District Court, Sabine County; V. H. Stark, Judge.

Trespass to try title by Mrs. S. E. Pulliam and others against the Temple Lumber Company and another. Judgment for plaintiffs, and defendants appeal. Affirmed.

W. T. Davis, of San Augustine, W. F. Goodrich and Minton & Lewis, all of Hemphill, and Cousins & Lipscomb, of Beaumont, for appellants.

Kennerly, Williams, Lee & Hill, of Houston, and Jas. G. Barker, of Hemphill, for appellees.

O'QUINN, J. This is a suit in trespass to try title to the Henry Canfield league of land situated in Sabine county, less certain named tracts, brought by appellees against appellants. In addition to the statutory action of trespass to try title appellees, plaintiffs below, pleaded the 3, 5, and 10 years' statutes of limitation.

Appellants, defendants below, answered by general demurrer, general denial, plea of not guilty, and the statutes of 3, 5, and 10 years' limitation.

At the conclusion of the evidence appellants requested a peremptory instruction in their favor, which was denied by the court, and the case submitted to the jury upon the following special issues:

"Question No. 1: Did N. B. Mason, sheriff and tax collector of Sabine county, Tex., in the year 1881 execute a tax deed to W. T. Pulliam for the Henry Canfield league in Sabine county, Tex., except the Gilbert Morris 350-acre tract?"

To which the jury answered, "Yes."

"Question No. 2: Did J. J. Love enter upon the Henry Canfield league by and with the consent and permission of W. T. Pulliam, to hold the same for him?"

To which the jury answered, "Yes."

"Question No. 3: Did William Mitchell clear and hold possession of the encroachment across his (Mitchell's) west boundary line, as a tenant by permission of W. T. Pulliam, on the Henry Canfield league?"

To which the jury answered, "Yes."

"Question No. 4: If you have answered Question No. 3 'Yes,' then you will answer the following:—In what year did William Mitchell so clear and take possession of the encroachment?"

To which the jury answered, "1889."

"Question No. 5: Did the lease from E. B. Sherrod and wife to Temple Lumber Co. cover only the Mitchell encroachment, or did it cover all the land described in the deed from the Simpson Bank to T. L. L. Temple?"

To which the jury answered, "Mitchell encroachment."

"Question No. 6: Did E. B. Sherrod cultivate, use, or enjoy any of the land in controversy outside of the Mitchell encroachment?"

To which the jury answered, "No."

"If you answer Question No. 6, 'No,' you need not answer the following question, but if you answer it 'Yes' then you will answer:

"Question No. 7: Has E. B. Sherrod cultivated, used, or enjoyed any of the land in controversy outside of the Mitchell encroachment since December 31st, 1915?"

(Not answered as per instructions of the court.)

"Question No. 8: Did W. T. Pulliam in person or by tenants have 10 years' peaceable and adverse possession of the tract of land in controversy or any part thereof, between January 1, 1884, and August 25, 1922, the date when this suit was filed?"

To which the jury answered, "Yes."

"Question No. 9: Did W. T. Pulliam, in person or by tenants, have 10 years' peaceable and adverse possession of the tract of land in controversy, or any part thereof, between January 1, 1884, and January 1, 1907?"

To which the jury answered, "Yes."

"Question No. 10: Which is the truth south line of the Henry Canfield league, the 'northern line' or the 'southern line', both of which lines were testified to and identified by Reggie Goodrich and Burton Halbert?"

To which the jury answered, "Southern line."

At the request of appellants, the following special issues were submitted:

Special Charge No. 6: "Did the tax deed executed by N. B. Mason to W. T. Pulliam purport to convey all of the land on the Henry Canfield league except the Gilbert Morris 350-

acre tract or did said deed purport to convey only 3,178 acres?"

To which the jury answered, "All the league, except 350 acres."

Special Charge No. 8: "Did J. J. Love occupy the T. R. Smith 150 acres from the time he moved on the place until he sold to T. R. Smith in 1900, claiming it as his own, or as a tenant of W. T. Pulliam?"

To which the jury answered, "For Pulliam."

Special Charge No. 12: "If you have answered that William Mitchell was a tenant of W. T. Pulliam, then answer how long he remained Pulliam's tenant, stating your answer in years."

To which the jury answered, "11 years."

Upon the findings of the jury judgment was rendered in favor of appellees for all of the land, except certain mentioned tracts; the judgment being for about 1,300 acres. Motion for a new trial was made and overruled, and appellants prosecute this appeal.

[1] Appellants' first assignment of error attacks the finding of the jury in answer to special issue No. 1 that N. B. Mason, sheriff and tax collector of Sabine county, in 1881 executed a tax deed to W. T. Pulliam for all of the Henry Canfield league of land, except the Gilbert Morris 350-acre tract, and insist that said finding is so contrary to the evidence that it is manifestly wrong.

We think the assignment should be overruled. The record discloses that W. T. Pulliam, some time in 1865, settled on the league of land in question, but that he did not make any claim to the land until in 1881, when he received a tax deed from N. B. Mason, the sheriff and tax collector of Sabine county, which deed the jury found conveyed the league, less 350 acres in the name of Gilbert Morris. W. T. Pulliam died in 1919. The tax deed was not placed of record, was shown to be lost, and secondary evidence adduced as to what it conveyed. It was shown that the deed had been delivered to Judge James T. Polly some time about 1906, and that shortly after its being delivered to him he died, and that diligent search had been made in his office and among his papers for the deed, and that it could not be found, nor could it be found anywhere.

W. T. Pulliam, a son of W. T. Pulliam, who received the tax deed from the sheriff and tax collector, testified:

"I have read that deed several times. It described the Henry Canfield league down here, except the 350 acres that was sold to Morris. It described all of the Henry Canfield league except the Morris tract—Gilbert Morris, I think, was the name. That deed was made to my father by N. B. Mason, the sheriff of Sabine county, and was made in 1881—June 7th. I say that in that tax deed the whole of the Henry Canfield league was conveyed to my father, except the Gilbert Morris 350 acres. My father claimed that whole league under that tax title except the 350 acres. He lived on the league and started to claim it right immediately after he bought it. I mean by that, immediately after he got the tax title. He was living on it at that time."

The Morris 350 acres mentioned were 350 acres out of the Henry Canfield league in question that were sold by sheriff Mason to Gilbert Morris for taxes in 1880. The 350 acres were shown to have specific metes and bounds.

Mrs. J. J. Love, a daughter of W. T. Pulliam, testified:

"I remember when my father got that land. It was in 1881. He bought it at tax sale right here in Hemphill, and got a deed to it. I know that because I have seen and read it—I couldn't count the times to save my life; I have seen it so many times. * * * I know what land it conveyed. It covered all the Henry Canfield league except 350 acres. That 350 acres was Mr. Gilbert Morris'. My father claimed the land described in his deed. He said that he bought it and paid for it and that it belonged to him."

Mrs. McDaniel, a daughter of W. T. Pulliam, testified:

"I just know that my father had a deed to that land because I saw it. I saw it too numerous to mention. * * * I know what land that deed purported to convey; it was the Henry Canfield league, all except 350 acres of Mr. Morris. * * * The deed purported to convey and described all the Henry Canfield league, except the Morris 350-acre tract. It was dated in 1881."

Mrs. S. E. Pulliam, widow of W. T. Pulliam, testified:

"My husband and I never claimed any part of the Henry Canfield league until after he got his deed. He got a deed from the sheriff of Sabine county. N. B. Mason was the sheriff and tax collector of Sabine county. My husband got a tax deed. I have seen that deed myself lots of times. It was kept in the trunk in our house, and I saw it from time to time. * * * The tract of land conveyed in that deed was the Henry Canfield league—the same league we lived on right there. It didn't convey all of the league; it was lacking 350 acres that Mr. Morris bought the year before my husband bought it. The tax deed to my husband was for all of the Henry Canfield league except the Morris 350-acre tract."

It was admitted that N. B. Mason at the time in question was the sheriff and tax collector of Sabine county, Tex.

In their original brief filed herein appellants do not contend that it was not shown that W. T. Pulliam received a tax deed from N. B. Mason, the sheriff and tax collector of Sabine county, to land in the Henry Canfield league, but they insist that the tax deed was to 3,178 acres of said league undescribed, and that said deed was void for want of description. In other words, the contention of appellants in said brief is not that a deed from Mason to Pulliam is not shown, but as to what the deed conveyed. This contention was based on the following records, which were in evidence:

(a) "Record of Tax Sales of Lands and Town Lots in Sabine County for 1880.

(Fourth line from top):-
Unknown, Abstract No. 4, Henry Canfield.
Number acres rendered: 3,178 acres.
Number acres sold: 3,178.
State taxes: $8.02.
County taxes: $8.02.
Costs: $2.50.
Total tax and costs: $18.54.
To whom sold: W. T. Pulliam.
"Ordered that court stand adjourned until the 16th of July A. D. 1881."

(b) "State of Texas, Comptroller's Department.

"I, Lon A. Smith, Comptroller of Public Accounts of the state of Texas, do hereby certify that Volume R–Z, 1880, Record of Tax Sales, which is a part of the archives of this office, on page 125, shows heading as follows:
"June 7, 1881, per Deeds, Record of Tax Sales 'of Lands and Town Lots in Sabine County."
"I further certify that, among the entries under the above-mentioned heading, the following entry appears:

| | |
|---|---|
| By whom rendered... | Unknown |
| Abstract No.......... | 4 |
| Grantee............. | Henry Canfield |
| No. acres rendered... | 3,178 |
| No. acres sold........ | 3,178 |
| State tax............ | $8.02 |
| County tax.......... | $8.02 |
| Costs................ | $2.50 |
| Total tax and costs.. | $18.54 |
| To whom sold........ | W. T. Pulliam." |

Appellants contend that, as the record of the commissioners' court of Sabine county and the records of the comptroller's office above set out show that for 1880 only 3,178 acres of the Henry Canfield league were rendered to unknown owners and became delinquent and were sold to W. T. Pulliam, that under the presumption that public officers are presumed to have done their duty, therefore it must be presumed that the sheriff sold only 3,178 acres of the league to Pulliam and made a deed to him for that number of acres only, and that, as no description of the 3,178 acres was shown, the deed was void for want of description.

This contention was settled in favor of appellees by the verdict of the jury. In answer to special issue No. 1 submitted by the court the jury found that the tax deed to Pulliam conveyed all of the Henry Canfield league, except the Morris 350 acres; also, in answer to special charge No. 6 requested by appellants, which reads: "Did the tax deed executed by N. B. Mason to W. T. Pulliam purport to convey all of the land on the Henry Canfield league except the Gilbert Morris 350-acre tract, or did said deed purport to convey only 3,178 acres?" the jury answered: "All the league, except 350 acres."

These findings of the jury, we think, are amply supported by the record. Four witnesses testified that they had read the deed in question a number of times, and that it conveyed the whole league except the Morris 350 acres. The jury were the judges of the credibility of the witnesses and the weight to be given to their testimony, and they so found.

[2] Appellants, in response to appellees' brief, in a reply brief filed some time after the submission of the case by counsel who neither tried the case below nor participated in its submission here, make the contention that it was not shown that the tax collector, Mason, executed a deed to Pulliam to the land—that the evidence in the record was not sufficient to show a deed to Pulliam. No contention of this kind was made in the trial court, nor in this court until the filing of said brief. Appellants in the trial court treated the deed as established; their only contention as to same being the amount of land that it conveyed, they there, as in their original brief here, insisting that it conveyed only 3,178 acres of the league. At the request of appellants, the court submitted to the jury the special issue:

"Did the *tax deed* executed by N. B. Mason to W. T. Pulliam purport to convey all of the land in the Henry Canfield league except the Gilbert Morris 350-acre tract, or did said deed purport to convey only 3,178 acres?" (Italics ours.)

[3, 4] The jury settled this contention against appellants by finding that the tax deed conveyed all the league, except the Morris 350 acres. No such contention is made in the motion for a new trial, and there is no assignment of error by appellants that the evidence is not sufficient to show that a tax deed was made by Mason to Pulliam. Furthermore, as the case was tried below upon the theory that Pulliam had a tax deed from Mason to the land, it is too late to make the contention in this court that no deed to Pulliam had been established. Boatner v. Ins. Co. (Tex. Com. App.) 241 S. W. 136, 140. Moreover, appellants having requested the court to submit this issue to the jury, they are not in position to complain of the insufficiency of the evidence to support the jury's finding. The request for submission of the several special issues requested by appellants was not made contingent upon the action of the court in refusing to give their special charge No. 1 for an instructed verdict in their favor. Schaff v. Gooch (Tex. Civ. App.) 218 S. W. 788. They took their chances in an effort to defeat appellees before the jury, and should not now complain. Hanrick v. Hanrick, 110 Tex. 59, 67, 173 S. W. 211, 214 S. W. 321; Wade v. Bank (Tex. Civ. App.) 263 S. W. 657; Shear Co. v. Smith (Tex. Civ. App.) 250 S. W. 727; Smith v. Harris (Tex. Civ. App.) 252 S. W. 843; Tube Co. v. Oil Co. (Tex. Civ. App.) 264 S. W. 108; Gosch v. Vrana (Tex. Civ. App.) 167 S. W. 757; Poindexter v. Receivers of Kirby Lumber Co., 101 Tex. 322, 107 S. W. 42; Pyron v. Brownfield (Tex. Civ. App.) 269 S. W. 202, 204. It is true that appellants asked for an

instructed verdict in their favor, but, in view of the record, we think it obvious that it could not be granted. In such cases we do not think that a litigant who asks for an instructed verdict, upon its being refused, can then request and have submitted special issues going to the heart of the case, and, upon the jury answering the requested issues against him, assign error that the verdict is not supported by the evidence. Shear Co. v. Smith (Tex. Civ. App.) 250 S. W. 727; Pyron v. Brownfield (Tex. Civ. App.) 269 S. W. 204. However, if such contention of appellants should be considered, we are of the opinion that the evidence fully established the deed and its contents. Parks v. Caudle, 58 Tex. 220; Simpson Bank v. Smith, 52 Tex. Civ. App. 349, 114 S. W. 445; Baldwin v. Smith (Tex. Civ. App.) 181 S. W. 785; Bounds v. Little, 75 Tex. 316, 12 S. W. 1109.

[5] Appellants' sixth assignment of error complains that the finding of the jury that W. T. Pulliam in person or by tenants had 10 years' peaceable and adverse possession of the land in controversy between January 1, 1884, and August 25, 1922, the date this suit was filed, is contrary to the evidence, without evidence reasonably sufficient to support same, and manifestly wrong.

This assignment is overruled. W. T. Pulliam settled on the land in question some time in 1865, opened up some 45 acres to cultivation, erected various improvements thereon, and used same, but he did not make any claim of ownership to the land until after he received the tax deed in 1881. Under the law the owner of land sold for taxes had two years from and after the tax sale in which to redeem same. As there was no proof of the exact date of the tax deed, the sale having been made in 1881, the two years would have to be computed as beginning January 1, 1882, and the two years would therefore expire January 1, 1884. During these two years limitation did not run in Pulliam's favor, but would begin with the year 1884. This suit was filed August 25, 1922. Pulliam's possession prior to receiving the tax deed was neutral. Immediately after getting the tax deed, he began claiming the land by virtue of the deed. If he gave the record owner either actual or constructive notice of his adverse claim, then the extent of his claim was referable to the deed under which he claimed. Craig v. Cartwright, 65 Tex. 422; Burnett v. Atteberry, 105 Tex. 128, 145 S. W. 582; Houston Oil Co. v. Jones, 109 Tex. 89, 198 S. W. 290. Immediately after getting the tax deed, he took possession of the entire tract conveyed by the deed, and openly and notoriously claimed same. He sold several tracts, amounting to more than 1,000 acres, executing deeds to the purchasers, who went into possession, improved and used same. He cut, sold, and removed large quantities of timber from the land. Through his tenants he opened up new land for cultivation, and exercised all the attributes of ownership over it. He continued to live on the land until the fall of 1883, when he moved to a water mill in the community, but off of the Henry Canfield league, which he had purchased. When he moved to the mill, he left his son-in-law Johnson in possession, and he remained in possession until 1885. When Johnson moved off, another son-in-law of Pulliam, Tom Rogers, took possession as his tenant, and remained in possession until 1887. When Rogers moved off in 1887, Pulliam placed another son-in-law, J. J. Love, in possession, and he remained on the premises until in the year 1900. Pulliam promised Love to give him 160 acres of the land, to include the improvements at the old place if he would stay on the premises, hold possession, and look after same for him. Appellants contend that Love went on the land claiming for himself and not for his father-in-law, Pulliam, but this question was submitted to the jury, and they found that Love entered the premises as the tenant of Pulliam. Although the court in its main charge had submitted that issue to the jury, appellants had the court to submit this very question to the jury in special issue No. 8, prepared and requested by them, and to this issue the jury also answered that Love was occupying the premises as a tenant of Pulliam from the time he moved on the land until in the year 1900. In 1900 Love sold the 160 acres that Pulliam gave him for occupying the land to T. R. Smith. The premises were occupied, and the inclosed land cultivated each and every year from 1881 until 1900 by the various parties in possession.

The record further shows, and the jury found, that William Mitchell, who owned and lived on a part of the Henry Canfield league adjoining the land in controversy, by an agreement with Pulliam extended his improvements across the land onto the land claimed by Pulliam, and cleared and fenced a number of acres, and cultivated same under an agreement with Pulliam to hold the land as a tenant of Pulliam. The jury also found, in answer to special issue No. 12 submitted at the request of appellants, that this possession of Mitchell as the tenant of Pulliam continued for 11 years. We think that the record sufficiently supports these findings.

But appellants contend that, W. T. Pulliam having been in possession of the 160 acres sold by Love to T. R. Smith (a part of the land in controversy) from 1865 to 1881, the date of his purchase at tax sale, that he thus matured title by limitation to the 160 acres, and that after 1881, the date of the tax purchase, he did not place his tax deed of record, nor extend his improvements, nor did any other act that would put the record owner upon notice that he was claiming more than 160 acres, therefore the possession of Love did not extend to the land in controversy outside of the 160 acres.

This contention of appellants is based upon the assumption that, Pulliam having lived on the Henry Canfield league from 1865 to 1881, he therefore had matured title to 160 acres of said land to include his improvements. This assumption is not supported by the record. The evidence is undisputed that, as we have above said, while Pulliam had settled on the Henry Canfield league in 1865 and made improvements, and continuously occupied and used same up to the date of his tax purchase in 1881, still he made no claim of ownership to the land whatever until he received the tax deed, and that immediately after getting his tax deed he took possession of the entire tract conveyed by the tax deed, and openly and notoriously claimed same, stating to various persons that he had bought the land, that it was his, sold several tracts amounting to more than 1,000 acres, cut, sold, and removed large quantities of timber from the land, through his tenants opened up new land for cultivation, and exercised all the attributes of ownership over it. Not only did he do these things, but soon after he got the tax deed one Weathered, who was the agent and representative of the record owners of the land, went to see Pulliam about his (Pulliam's) claiming the land, and wanted to sell the land to Pulliam, and Pulliam told him that he, Pulliam, had bought the land, that he had a deed to it, and finally told Weathered to leave, saying:

"I don't want to fool with you any more. I have bought that land, and if you want to bring suit you can bring it, but I am not going to fool with you any more."

We think the record amply shows both constructive and actual notice to the owners of Pulliam's claim and of its extent, and that the evidence amply supports the jury's finding that Pulliam, in person or by his tenants, had and held peaceable and adverse possession of the land for more than 10 years prior to the filing of this suit.

[6] In their reply brief before mentioned appellants contend that, in order for Pulliam's possession and limitation in his favor to be extended to the boundaries contained in the tax deed, the deed must have been of record. This contention is not sound. Article 5676, Vernon's Sayles' Civil Statutes; Craig v. Cartwright, 65 Tex. 423; Hays v. Hinkle (Tex. Civ. App.) 193 S. W. 156; Simpson Bank v. Smith, 52 Tex. Civ. App. 349, 114 S. W. 445; Bringhurst v. Texas Co., 39 Tex. Civ. App. 224, 87 S. W. 898 (writ of error refused). To sustain their contention appellants cite us to Watts v. Bruce, 31 Tex. Civ. App. 347, 72 S. W. 260; Doom v. Taylor, 35 Tex. Civ. App. 251, 79 S. W. 1086; McDonald v. Stanfield (Tex. Civ. App.) 197 S. W. 892; and Odem v. Leahy (Tex. Civ. App.) 264 S. W. 218. The first two cases were by the Galveston Court of Civil Appeals, and were subsequently overruled by the same court in the case of Bringhurst v. Texas Co., supra, and this was upheld by the Supreme Court refusing writ of error. McDonald v. Stanfield follows the overruled cases of Watts v. Bruce and Doom v. Taylor, and we do not consider Odem v. Leahy in point, but, if so, then it is in conflict with Craig v. Cartwright, 65 Tex. 423, and the other cases cited supra.

Appellants complain that the answer of the jury to the ninth special issue is not supported by the evidence. There was a dispute as to which was the true south line of the Henry Canfield league. Appellants contended that it was what was termed the "northern line," while appellees insisted that it was the lower or "southern line." The jury answered, "The southern line." We think the evidence is sufficient to sustain the jury's finding.

[7] Appellants say that the jury's finding in answer to special issue No. 5 that the lease from E. B. Sherrod and wife to appellant, Temple Lumber Company, covered only the Mitchell encroachment is not supported by the evidence. The Mitchell encroachment is the land that William Mitchell cleared on the Henry Canfield league and cultivated, as the tenant of Pulliam above discussed. It appears that, after getting his tax deed, Pulliam sold 196 acres of the Canfield league to Bill McDaniel, and McDaniel sold the same to William Mitchell in 1885, and Mitchell sold to Jim Deas in 1900, and that Deas sold to Sherrod in 1907. After Sherrod bought the 196 acres in 1907 or 1908, he took a lease to the land inclosed by Mitchell and claimed by Pulliam from appellant, Temple Lumber Company. Whether this lease covered only the land designated as the "Mitchell encroachment" or the whole of the tract claimed by appellants was a contested issue in the trial of the case. Appellants insisted that it covered the whole tract, while appellees said it covered only the Mitchell encroachment, or the land inclosed by Mitchell. This question was submitted to the jury, and they found that it covered only that portion known as the Mitchell encroachment. The lease had been lost, and secondary evidence of its contents was given. We have carefully considered all the evidence bearing upon the issue, and think it supports the jury's finding. Furthermore, as Mitchell was a tenant of Pulliam, those succeeding him took in the same capacity as Mitchell, and were therefore tenants of Pulliam, since they held and used the same land in the same right, and did not make claim for themselves, and did not repudiate that of Pulliam. So, when Sherrod took possession of the land, he took as Pulliam's tenant, and, for the lease by him from the Temple Lumber Company to have affected Pulliam's claim, Sherrod's repudiation of Pulliam's title must have been brought to Pulliam's notice. This was not in any wise done. Buford v. Wasson, 49 Tex. Civ. App. 454, 109 S. W. 278; West Lumber Co. v. San—

ders (Tex. Civ. App.) 225 S. W. 829; Gilbert v. Gum (Tex. Civ. App.) 265 S. W. 725; Cobb v. Robertson, 99 Tex. 138, 86 S. W. 746, 87 S. W. 1148, 122 Am. St. Rep. 609.

[8] Appellants present a number of assignments asserting that the court erred in excluding certain evidence. The bills of exception to the action of the court in excluding the proffered evidence clearly show that in each instance appellees objected to the evidence offered, and that the court sustained the "said objections." The bills of exception wholly fail to show the grounds of objection that were made by appellees to the evidence tendered. Failing to do this, they are insufficient and point out no error. District court rule 58; Lumber Co. v. Railway Co., 106 Tex. 12, 155 S. W. 175; Carlton v. Conkrite (Tex. Civ. App.) 249 S. W. 522; Produce Co. v. Roddy (Tex. Civ. App.) 249 S. W. 249 (writ refused); Wilkins v. Railway Co. (Tex. Civ. App.) 260 S. W. 214; Bank v. Smith (Tex. Civ. App.) 160 S. W. 313.

[9] Appellants' forty-third assignment of error asserts that the court erred in refusing to set aside the judgment and grant a new trial because of newly discovered evidence after the trial. The alleged newly discovered evidence was that of two witnesses, W. C. Mason and William Mitchell, whose affidavits were attached to the motion for new trial, and was in the nature of rebuttal evidence to the testimony of John Mitchell given for appellees.

We do not think that the court erred in refusing the motion for a new trial because of newly discovered evidence. Mason's affidavit does not disclose any material evidence. As we view it, it consisted in the main of his conclusions and opinion as to the business of his father-in-law, Deas. Mitchell's affidavit is:

"State of Louisiana, Parish of Vernon.

"Before me, the undersigned authority, on this day personally came and appeared W. M. Mitchell, known to me, who, after being by me first duly sworn, deposed and says:

"I am the person who owned the 196½ acres of land on the Henry Canfield survey in Sabine county, Tex. I bought this property from Wm. W. McDaniel, and moved on it the same year I bought it. After I had been on the place seven or eight years I took in about 5 acres of land adjoining my land on the west. I did not consult any one about taking this land in my field. It was good farming land, and I could use it to advantage. I never tried to hold it by any claim, and I did not sell it when I sold my place. The first and only person I ever spoke to about having this land in my field was a stranger who came in there and was looking after timber that had been cut on land adjoining mine. This was several years after I had begun working this 5-acre tract on the west of my land, on the Henry Canfield survey. He said that Mr. Scott Arthur, the surveyor, had told him about me having this land in my field, but that he knew I was not making any claim to the land, and it was all right for me to use

272 S.W.—38

it. I moved off the place the year I sold it to Jim Deas. W. M. Mitchell.

"Sworn to and subscribed before me at Leesville, La., this September 28th, 1923.

"[Seal] C. E. Hardin, Notary Public."

Mitchell, in his affidavit, does not in terms deny the statements of his son. He nowhere mentions Pulliam's name. Evidently he made the affidavit at the request of and after consultation with some one representing appellants. We think it remarkable that in making an affidavit as to whether he took possession, cleared, and cultivated the land under an agreement with Pulliam that he entirely omits to even mention Pulliam. If his affidavit shows material, relevant testimony, we think there was lack of diligence on the part of appellants to discover same. Pulliam, after getting the tax deed in 1881, sold 196 acres of the land to McDaniel. McDaniel sold his 196 acres to William Mitchell in 1885. John Mitchell, son of William Mitchell, testified that his father, William Mitchell, by an understanding with Pulliam, fenced, cleared, and cultivated a portion of the land claimed by Pulliam and in dispute here, agreeing with Pulliam to look after the land claimed by Pulliam, and to report to Pulliam any trespassers cutting timber on the land in return for the use of the land fenced and cultivated. That his father, William Mitchell, held possession of and used the land until in the year 1900. It further appeared that Mitchell sold his land to Deas, who went into possession, and also used and cultivated the Pulliam land inclosed by Mitchell. Deas sold the 196 acres to Sherrod in 1907. Sherrod went into possession of the land bought by him, and also used and cultivated what is called the Mitchell encroachment. Some time in 1907 or 1908 appellant, Temple Lumber Company, through its agent, S. P. McElroy, secured an acknowledgment of tenancy from Sherrod and wife. Appellants contend that this acknowledgment of tenancy covered the whole of the land in dispute. Appellees insist that it covered only the Mitchell encroachment. The lease was not of record, had been lost, and was proven by secondary evidence. The jury found that it covered the Mitchell encroachment only. This encroachment of land fenced by Mitchell had been fenced and cultivated for some 18 years at the time Sherrod bought from Deas and at the time Sherrod and wife acknowledged tenancy to appellant Temple Lumber Company. It must have been known to McElroy, appellant Temple Lumber Company's agent, that it was old, cleared, and cultivated land—it showed for itself, and was sufficient to put said agent upon inquiry as to when, by whom, and by what authority it was cleared, fenced, and first used. McElroy testified that he was born and reared in the county in which the land was situated; that he surveyed lands for appellants; that he surveyed the Mitchell place twice, once in 1906 and again in 1907.

He said that he discovered the Mitchell encroachment in 1906; saw the field over the line on the west. This was before Sherrod bought the premises from Deas. Sherrod was with him the last time that he surveyed it. He, McElroy, was at Sherrods when the acknowledgment of tenancy was taken. It does not appear that he made any inquiry as to who made the extension or by what authority it was made. An inquiry of Deas would have developed the fact that it was already cleared and fenced and in use when he bought from Mitchell. An inquiry of Mitchell would have given all the facts as to its clearing and use. No inquiry was made, nor any effort to find the facts. Railway v. Blanchard, 96 Tex. 616, 75 S. W. 6; Bank v. Garland (Tex. Com. App.) 235 S. W. 564; Griffith v. Gohlman Lester & Co. (Tex. Civ. App.) 253 S. W. 595; House v. Filgo (Tex. Civ. App.) 163 S. W. 375.

Furthermore, the trial of the case began on September 22d, and went to the jury September 27th, and the verdict was returned on September 28th. The testimony of John Mitchell was given in the development of appellees' main case, and thus appellants were in possession of his testimony at and before when they began their defense. They then knew of the importance of John Mitchell's testimony, and the whereabouts of his father, William Mitchell, for John Mitchell testified fully to same. No motion was made then or later for a postponement of the trial on the grounds of surprise at the testimony of John Mitchell, but the case proceeded, and was concluded without any effort to delay until they could communicate with William Mitchell, or otherwise. We think that, if appellants were surprised at John Mitchell's testimony, or regarded it as seriously affecting their case, such action on their part should have been taken. Railway Co. v. Barrett, 46 Tex. Civ. App. 14, 101 S. W. 1025, 121 S. W. 570.

Moreover, the case went to the jury September 27th, and the verdict was returned on the 28th. The affidavit of Mitchell is dated at Leesville, La., September 28th, the same day the verdict was returned. The original motion for a new trial was filed September 29th, and in it no mention is made of the Mitchell affidavit. The amended motion for new trial was not filed until October 18th, and the court adjourned for the term October 20th. This affidavit had been in the possession of the appellants from and after its date, September 28th. It was not brought to the attention of the court or appellees until the filing of the amended motion for a new trial, to which it was attached as an exhibit, on October 18th, two days before final adjournment of the court. This was too late to afford appellees an opportunity to contest the truth of the affidavit or to meet it in any way. It has repeatedly been held that a party should not only be diligent in discovering testimony, but also diligent in making use of same after its discovery, and that, when presented in a motion for a new trial under the circumstances here shown, the court does not err in refusing same. Railway v. Scarborough, 101 Tex. 436, 108 S. W. 804; Houston Oil Co. v. Kimball, 103 Tex. 94, 122 S. W. 533, 124 S. W. 85; Glover v. Pfeuffer (Tex. Civ. App.) 163 S. W. 987; Smith v. Folmar (Tex. Civ. App.) 224 S. W. 526.

Appellants present numerous other assignments, but, after carefully considering same, we do not think that any of them show error, and they are all overruled.

Believing that the judgment should be affirmed, it is so ordered. Affirmed.