**MILLER–VIDOR LUMBER CO. v. SCHREIBER et al.   (No. 1490.)** *

Court of Civil Appeals of Texas. Beaumont. June 18, 1927.

Rehearing Denied Sept. 21, 1927.

1. **Adverse possession** ⟵115(1)—**Evidence in suit to recover land held to raise issue of presumed grant to defendant's remote grantor.**

In suit to recover land, evidence *held* sufficient to raise issue of presumption of grant to defendant's remote grantor.

2. **Evidence** ⟵588—**Credibility of witness, testifying that defendant's remote grantor said he acquired title to land from another than plaintiffs' predecessors, held for jury.**

In action to recover land from corporation tracing title to plaintiffs' predecessors in title credibility of witness testifying that defendant's remote grantor told him 50 years before that he acquired title from another than such predecessors, was for jury.

3. **Estoppel** ⟵69—**Defendant held not estopped to claim grant to its remote grantor by plaintiffs' predecessors, because of testimony that such grantor said he acquired title from another party.**

Defendant, in suit to recover land, *held* not estopped to claim grant to its remote grantor by plaintiffs' predecessors in title, because of witness' testimony that such grantor told him 50 years before that he acquired title from another party.

4. **Trespass to try title** ⟵44—**Whether defendant's remote grantor held land under another than plaintiffs' predecessors in title held for jury.**

Whether defendant's remote grantor, to whom defendant claimed direct grant of land sued for by plaintiffs' predecessors in title, held such land or other lands under another party, *held* for jury.

5. **Judgment** ⟵682(1)—**Judgment awarding title to plaintiffs' predecessors held not estoppel or res judicata against claim of defendant's remote grantor.**

Judgment awarding title to land sued for to plaintiffs' predecessors in title, in suit against them by third party, *held* not an estoppel or res judicata against claim of defendant's remote

---

grantor, to whom defendant claimed direct grant from plaintiffs' predecessors; such judgment being for his benefit.

**6. Estoppel ⬅⟹35—Grantor acquiring outstanding title must hold it for grantee.**

Grantor acquiring outstanding title must hold it for his grantee.

**7. Appeal and error ⬅⟹882(3)—Appellant, asserting on trial that its remote grantor did not appear in prior partition suit as minor defendants' guardian, held estopped to assert his appearance as such.**

Defendant, taking position, on trial of suit to recover land, that its remote grantor did not appear as guardian of minor defendants in partition suit, *held* estopped on appeal to explain his appearance on such theory.

**8. Appeal and error ⬅⟹882(3)—Appellant cannot take position contrary to theory on trial.**

Party cannot take position before trial court, try his case on that theory, and then take contrary position on appeal.

**9. Trespass to try title ⬅⟹38(2)—Conveyance to plaintiffs' predecessors held not to warrant presumption that part of land was not previously conveyed to defendant's remote grantor.**

Conveyance of land sued for to grantor's minor children, under whom plaintiffs claimed, *held* not to warrant presumption that part thereof had not previously been sold to defendant's remote grantor, where conveyance included another part already conveyed to one who paid taxes thereon for several years.

**10. Trial ⬅⟹177—Party denied instructed verdict is entitled to submission of issues in his favor, though adversary also moves for instructed verdict.**

Party whose motion for instructed verdict is denied is entitled to submission of all issues in his favor to jury, though his adversary also moves for instructed verdict.

**11. Judges ⬅⟹55—Judge held not disqualified to try case after dismissal of his brother as defendant.**

Judge, who was brother of one defendant, *held* not disqualified to try case, after dismissal of such defendant, without objection or exception, when case was called for trial by special judge, where his interests were not further litigated.

**12. Principal and agent ⬅⟹3(1)—Instrument authorizing attorney in fact to complete title in himself held transfer of land certificate, not mere power of attorney.**

Instrument reciting appointment of attorney in fact to obtain and receive title to certain land under principal's headright certificate, and authorizing him to complete title in himself, his heirs, etc., forever, "hereby relinquishing to him all the right power vested in me respecting said land," *held* not a mere power of attorney, but a transfer of land certificate.

**13. Husband and wife ⬅⟹262(1)—Conveyance to husband makes property presumptively community.**

Conveyance of land to husband makes the property presumptively community.

**14. Husband and wife ⬅⟹267(1)—Sufficiency of wife's acknowledgment of husband's deed of community property to his grantor is immaterial.**

Execution of deed of community property by husband alone is sufficient to transfer title back to his grantor; hence sufficiency of wife's acknowledgment was immaterial.

**15. Husband and wife ⬅⟹267(2)—Deed signed by wife for herself and as husband's agent is sufficient, if power may be inferred from statement in acknowledgment and age of instrument.**

Deed signed by wife for herself and as agent for her husband is sufficient, if inference of existence of power named in notary's certificate arises from statement in acknowledgment and age of instrument.

**16. Descent and distribution ⬅⟹75—Children of deceased grantors need not show valid deed to recover land.**

Children, whose parents died without making any other conveyance of land, held title as heirs, and need not show valid deed to them from parents, to recover land.

**17. Trespass to try title ⬅⟹39(1)—Title acquired after ouster is inadmissible in suit to recover land.**

Title acquired subsequent to alleged ouster is not admissible in suit to recover land.

**18. Appeal and error ⬅⟹1170(7)—Introduction of quitclaim deed, executed by one defendant after his dismissal from suit to recover land, held not reversible error (Court of Civil Appeals rule 62a).**

In action to recover land, introduction of quitclaim deed, executed by one defendant after his dismissal from suit, *held* not reversible error, under Court of Civil Appeals rule 62a, though irrelevant to any issue.

**19. Appeal and error ⬅⟹837(11)—Appellate court may look to irrelevant quitclaim deed, executed by one defendant after his dismissal from suit, to uphold his brother's qualification to try case.**

Quitclaim deed, executed by one defendant after his dismissal from suit to recover land, may be looked to by appellate court in support of its ruling upholding qualification of judge, who is such defendant's brother, to try case, though not relevant to any issue.

**20. Adverse possession ⬅⟹104—Evidence that land sued for was generally known in community as belonging to defendant's remote grantor held admissible.**

In action to recover land, evidence that land was generally known in community as belonging to defendant's remote grantor was admissible on issue of presumption of grant.

**21. Adverse possession ⬅⟹104—Evidence of defendant's remote grantor's reputation for honesty and fair dealing held inadmissible on issue of presumed grant.**

In action to recover land, testimony as to general reputation of defendant's remote grantor for honesty and fair dealing *held* inadmis-

---

⬅⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

sible as of no probative force on issue of presumption of grant.

**22. Trespass to try title ⬤⟹39(2)—Evidence that defendant's remote grantor claimed land under plaintiffs' predecessor in title held admissible.**

In action to recover land, evidence that defendant's remote grantor claimed land under plaintiffs' predecessor in title would have been admissible.

**23. Evidence ⬤⟹271(9)—Trespass to try title ⬤⟹39(1)—Evidence that defendants secured opinion on title before purchasing land sued for held irrelevant, immaterial, and self-serving.**

Evidence that defendants secured opinion on title to land sued for before purchasing it *held* properly excluded as irrelevant, immaterial, and self-serving.

Appeal from District Court, Orange County; V. H. Stark, Judge. ·

Action by Florence Schreiber and others against the Miller-Vidor Lumber Company and others. Judgment for plaintiffs, and named defendant appeals. Reversed and remanded.

Oliver J. Todd, Charles S. Pipkin and A. D. Moore, all of Beaumont, for appellant.

Dies, Stephenson & Dies, of Orange, for appellees.

WALKER, J. Appellees, as the heirs of Mary Ellen Merriman (her maiden name), instituted this suit against appellant and other defendants, whose interests are not involved in this appeal, to recover the 320-acre Enner survey in Orange county. Appellant claimed 200 acres. On conclusion of the evidence, verdict was instructed by the trial judge against appellant and in favor of appellees, and on this judgment appellees were awarded recovery of the land. Mary Ellen Merriman's first husband was C. L. Bonville. After his death she married P. P. Province. Appellees' chain of title consisted of the following instruments:

"First. Assignment of certificate from James Enner to James Walea, covering certificate No. 17 for 320 acres of land.

"Second. Patent from state of Texas to James Enner, his heirs or assigns, for 320 acres of land by virtue of certificate No. 17.

"Third. Deed from James Walea to William Myres, dated February 21, 1853, conveying 320 acres of land of the James Enner survey.

"Fourth. Deed from William Myres and wife to James Walea, dated 21st day of November, 1853, and conveying to grantee 320 acres of land of James Enner survey.

"Fifth. Deed from James Walea to John Merriman, dated March 4, 1856, conveying the 320 acres of land in the James Enner survey.

"Sixth. Deed from John Merriman to C. L. Bonville, dated March 23, 1869, filed April 21, 1869.

"Seventh. Deed from Mary Ella Province et al. to Sarah Adeline Bonville et al., dated June 8, 1877.

"Eighth. Proof by Mrs. Florence Schreiber that C. L. Bonville was Mary Ella Bonville's first husband; that her second husband was P. P. Province; that by Mr. Bonville Mary Ella Province had two girls and one boy; that the boy died when it was born; that the name of the oldest girl was Sarah Adeline Bonville; that she is dead; that she was married twice; that her first husband was William Bundy, and she had one child by him, Charlie Bundy, who is now living; that her second husband was Leonard Richardson, by whom she had a girl, Mary Richardson, and the next child was a boy, Joe Richardson, and the next one was Edna, and the next one was Raymond; that the next daughter of Mary Ella and C. L. Bonville was Flavilla Bonville, whose first husband was Bud Watson; that both of them are dead; that they have three living children; that the first one is Henry Watson, and the next one is Edith Watson; that by her second husband, who was Jack Berwick, she has one child and that Hazel Berwick; that Mary Ella Bonville married P. P. Province and had one child who was and is Mrs. Florence Schreiber."

Appellant's chain of title consisted of the following: Deed from William McFarlane Lewis to A. M. Rogers, dated December 27, 1883; deed of trust from A. M. Rogers to D. McCall, dated June 17, 1885, to secure a note of $220; deed from A. M. Rogers to E. A. Smith, dated July 8, 1890; deed of trust from E. A. Smith to B. Wiley, dated October 13, 1891, to secure a note in the principal sum of $1,000; deed of trust from E. A. Smith to E. A. Smith & Sons Lumber Company, dated August 2, 1906; release of deed of trust from Smith to Wiley, dated October 13, 1891; deed from E. A. Smith & Sons Lumber Company to Orange Sawmill Company, dated February 4, 1907; deed from Orange Sawmill Company to Miller-Vidor Lumber Company, dated January 11, 1910. The deeds thus named as constituting appellant's chain of title convey the land claimed by it in this suit.

[1] Appellant assigns error against the charge of the court instructing a verdict against it in favor of appellees, on the ground that the evidence raised the issue of the presumption of a grant into its remote grantor, William McFarlane Lewis. We give the following statement on this issue from appellant's brief:

Mrs. Florence Schreiber, daughter of Mary Ellen Merriman, testified on cross-examination:

"I knowed we owned this land ever since I was real young, but you see Mr. Rogers was appointed guardian over it. I knew that we owned this land. My father died when I was about two months old. My mother has been dead about twenty three or four years.

"As to whether we paid taxes on the land or anything of that kind, well, we never was assessed to pay taxes on it. I thought it was looked after. No; I never rendered it to the

assessor for taxes. I did not know that the land was being claimed by other people. I didn't know that Mr. Smith was claiming it out there, or that Mr. Dennis Call was loaning money on it. I didn't know that Mr. Smith's title had come down to the Miller-Vidor Lumber Company, and that Mr. Stark owned part of it, and the T. & N. O. Railroad owned part of it.

"As to when we first began to actively assert title to the land and really do anything about it, well, they come and wanted to offer us a comprise over it—this lumber company did. They sent Mr. Watson to me and said that they wanted a quitclaim deed for it. They said they couldn't use the land, or a something, unless they got our signature. They claimed they had a deed and had lost it and couldn't do anything with it, and they said they would give us either seven hundred or eight hundred dollars for our names as signatures, so that they could use this land; and Mr. Watson told me to take it, and said if I didn't take that we wouldn't get anything; and he said that is all it was worth to us; and he said he could get it for us any time we wanted it—that amount of money.

"I hadn't done anything about it until then; no, sir. I didn't know this company was claiming it. I don't know who I thought was claiming it; I never thought much about it. No; when Mr. Watson came to us was not the first I began to do anything about it. It had been brought up a time or two before. There was a man from Houston came over and got a power of attorney, and he never came back any more and did anything with it, and that has been several years ago. He told us he would look into it, and he wanted a power of attorney and said he could get it as it was rightfully ours, and he never did show up any more. After that I never did any more about it, because none of the rest of the heirs never did bother about it. I don't know that the other heirs were asserting any more claim to it than we were; I just thought this much about it, if they come to us and offered us that much for the land for our names, and they couldn't do anything with it, I thought it ought to all belong to us.

"Mr. Watson said that, if we didn't take that, they might some time find a deed to that place and we wouldn't get anything. He wanted our quitclaim deed so that they could have the land. He come to me several times, and stopped me on the street, and had me to go to his office."

Redirect examination:

"I was 49 years old the 30th of last November. I think Adeline Bonville was 50 years old when she died, but her daughter is over there, and she can tell you."

Recross-examination:

"I was born and raised here in Orange. I have lived right here in town all this time. When you suggest that for 28 years after I was of age I didn't assert any title to the land, and didn't pay any taxes on it, well, we never was assessed any taxes."

Redirect examination:

"Dr. Province's name was Philip. As to whether his initials were P. P., well, Philip was his right name."

A. J. Lyons, witness for appellant, testified:

"My name is A. J. Lyons, I was born in Liberty county. I live here in Orange, and came to Orange in 1874. I am 65 years-old and past. I knew William McFarlane Lewis and A. M. Rogers in their lifetime. They are both dead. I worked some under Rogers, in the swamp, in 1880 and 1881, getting out timber. The swamp was known as the Mac Lewis swamp. It was above what is known as Smith's mill on the Enner tract; and there are other tracts in there too. I worked in there for Mr. Mac Lewis, getting out timber that had been deadened by the T. & N. O. Railroad Company. We were cutting ties out of it down here by the depot. They made a heap of ties at a little old mill they had by the freight depot. Yes; I did hear Mr. Lewis make a statement as to his ownership of the Enner land where I was working in the swamp. He claimed he owned the Mac Lewis swamp, which included that tract of land, and other tracts of land. There is a heap of that tract of land that is in the swamp. I don't remember whether I heard him make that statement more than one time; he was often round the camp, but I don't remember how many times I heard him. I don't know how long I was in there cutting ties for McFarlane Lewis. I worked in there two or three different high waters; we never would stay long at a time. I suppose the water would stay 8 or 10 days, maybe longer sometimes. I never did help deaden any timber, but I saw lots of it deadened. I was in there two or three different years; yes, sir. At that time I was working for Rogers, under Lewis. It was Rogers' camp. That was A. M. Rogers; yes, sir. I think I worked in there a little in 1879, 1880, and 1881. in highwater at different times; and I worked again in there in 1890, for Rogers.

"Q. And at the time you were working for Mr. Rogers, did you ever hear McFarlane make any statement as to whether he did or did not own any of the James Enner, limited to the swamp. A. Well, it was my understanding—I don't know. He may have stated that he owned it. I wouldn't say positively he did or didn't."

Cross-examination:

"I was about 19 or 20 years old at the time I first went on that land. I am now 65 years of age. As well as I remember it was in 1879, 1880, and 1881, I was in there. I never worked in there in 1882; I was in Louisiana in 1882. I suppose I stayed in Louisiana about four months in 1882. I then returned to Orange, and have never left out of Orange county since. I worked in Newton county in the timber business in the fall of 1880 and spring of 1881. I was in Newton county from October to February, I think, as well as I remember.

"No; I would not undertake to tell definitely who deadened that timber on that property that I noticed. I couldn't say that I recollect an injunction being gotten out to restrain the parties who were cutting that timber at that time. If I ever knew it I have forgotten; I don't remember any injunction.

"It was general opinion that Mr. Mac Lewis owned the swamp land. I had a conversation with him about that; I have heard Mac Lewis claim the swamp. I can't recollect just whether he ever told me he "owned" the swamp; that is, in that particular place. I do know definitely that he told me he owned some of that swamp. I can't say where it was. I don't re-

member where we were when he told me. I was with him a good many times. The men that were present at the camp at that time are all dead. I believe. There was old man Henry Bland might be able to tell you. That is one man I think was in the camp. I don't say he was present at the time of that conversation. I am not positive about that. I don't remember whether he was or not.

"When I first went on this land was about 1879 or 1880. I don't know who was actually the record owner of the land at that time, only from hearsay. I don't know that at that time Wm. McF. Lewis was the guardian for the Bonville children. No; I never knew he was guardian for those children.

"Yes, sir; he claimed that land in there prior to 1893; I don't know whether he had a deed to it; I never saw any deed. He told me at that time he was claiming the land, yes, sir.

"It was some time after 1890 that Mr. Rogers got the land. Rogers was his foreman in the swamp. I understood that Mr. Rogers was the guardian for the Bonville children. I never heard Rogers assert ownership to this particular property, yes, sir. I always knew he claimed to own it all the time, after he bought it from Mac Lewis. Rogers was the owner of it after 1890 all along, yes; he told me time and again. He told me that some time along about 1890 or along in there. It might have been 1888 or 1889. I don't know that I remember ever having a conversation with him before 1890, about his ownership. He didn't tell me then that he had charge of it as guardian for those children, but for Mac Lewis."

Albert Lyons, witness for appellant, testified (direct examination):

"I live in the town of Orange. I have lived in Orange county ever since 1865. I knew William McFarlane Lewis and A. M. Rogers in their lifetime. I knew them intimately.

"I had occasion to talk to Mr. Lewis quite a bit, I worked in the swamp there for him. That was a piece of land he bought out there; that swamp he said he bought from old Capt. W. Smith. That is right about this direction from the town of Orange (indicating). I am acquainted with what is known as the Smith mill tract out there. The swamp is sort of northeast or north of that mill. I know where the crossing is on the T. & N. O. Railroad Company, what is known as the Newton county road crossing. Now there are two crossings on that road. The swamp that I worked in is about northeast or north from the first crossing going out.

"While I was working in there, Mr. McFarlane Lewis told me he owned the swamp land. I am not positive whether he made that statement more than once. He may have done it several times, but I know he said he had bought it. He told me that he had bought it from Judge Smith. As to who Judge Smith was, well that is all I can tell you about it, old Capt. Bill Smith. I don't know that he held any official position in Orange county; I think he was a judge of some kind before I come here; I just suppose that, by him being called that.

"I knew Mrs. Bonville that lived here several years ago. I don't know for certain whether Mr. Smith was any relation to her, but I am sort of inclined to think he was. I don't know that McFarlane Lewis made any statement to me as to when he purchased that land from Smith, or whether it was for himself or some one else.

"I was a son-in-law of McFarlane Lewis. I married his daughter. I knew A. M. Rogers; he and I were brothers-in-law. We married sisters. Rogers married a Lewis, yes, sir.

"I never worked with Mr. Rogers in that swamp after he got it. I never heard both him and old man Lewis say that he had bought it; I mean that Rogers had bought it from Lewis, yes, sir; and he got timber out of there after that. I never heard them claim that swamp land for anybody else.

"I know about when Mr. Rogers sold that land, but I don't remember the date. During the time that Mac Lewis and Rogers were claiming the land, I never heard of any adverse claims to that swamp land in there."

E. H. Green, witness for appellant, testified:

"My name is E. H. Green. I live in Beaumont, Jefferson county, Tex. I am secretary and treasurer of the Miller-Vidor Lumber Company. I have been connected with Miller-Vidor direct since 1910 and prior to that time, 1905, I was in one of their joint properties. I was with the Beaumont Sawmill Company prior to being with the Miller-Vidor Lumber Company.

"We bought the land in controversy from the Orange Sawmill Company in 1910. Miller-Vidor Lumber Company did not have the title examined.

"The Miller-Vidor Lumber Company has claimed that property since the time of our purchase. We have paid taxes on the property; some years we couldn't afford to pay them then, and let them ride over, but we paid the penalty and interest. We finally paid the taxes, yes, sir.

"It was not until recently that I knew of any adverse claim to our title. The first intimation I had of it was a doctor wanted to drill a well up here on ——— Island and wanted to lease it, and we let him have the abstracts, and he come back and. * * * It was some two or three, or three or four years ago that I first learned of an adverse claim being made against this property, against our claim to it. Prior to that time I did not know of any claim being asserted by the Bonville heirs, or by any one for them."

Cross-examination:

"No; I didn't know that the record showed that they owned the land. It is not a fact that we were informed of this claim in 1904. I am speaking now for the Miller-Vidor Lumber Company. I didn't, of my knowledge, have notice of the claim of the Bonville heirs along about 1904. As to whether any of the other officers of the company had notice of it at that time, within my knowledge, well, it probably developed, since then—in looking through the record, I didn't know it; I couldn't say what information the other officials of the company had concerning the title."

Chas. Cottle, witness for appellant testified:

"My name is Charles Cottle. I live in Orange, and work in the tax collector's office. I am familiar with and am the custodian of the books and records. I looked up the matter of renditions and tax payments on the James Enner 320-acre survey in Orange county this morning.

"The records show that from 1885 to 1890 A. M. Rogers rendered 200 acres, for all those years; from 1891 to 1906, A. E. Smith rendered 200 acres; 1907, 1908 and 1909, Orange Sawmill Company rendered 200 acres; 1910 and from 1915 to 1925 Miller-Vidor Lumber Company rendered 200 acres. ·

"Now there are unknown owners; 1911, 185 acres; 1912, 184 acres; 1913, 194 acres; 1914, 196 acres.

"When I said from 1885 to 1890, that means inclusive. Each one of those means inclusive, and that applies to the other years.

"During the time Mr. Rogers rendered the land there are no delinquent taxes as reflected by our records; nor from 1891 to 1906, during the time A. E. Smith owned it.

"The records do not show where the Bonvilles or Schreibers or Richardsons or Bundys or Berwicks rendered and paid taxes on any of that property. Our records go back to 1885; that is as far as the tax records go. Our records are ·silent as to people who had rendered prior to that time."

From the recitations in judgment No. 420, William McFarlane Lewis v. Skinner, Gifford & Co., it appears that Lewis sold to Skinner, Gifford & Co., on May 2, 1876, 900 cypress trees on the James Enner survey and other lands; that Skinner, Gifford & Co. failed to pay the purchase price; that Lewis instituted suit thereon, sued out· a writ of attachment, and secured judgment for the amount of his debt, with foreclosure of his attachment lien on the timber.

We take the following statement of the payment of taxes on the Enner survey from appellant's brief:

"Defendants offered in evidence a statement from the office of the comptroller of the state of Texas showing rendition on the James Enner survey, which showed rendition of 320 acres of William Myers in 1853; the same amount by James Walea in 1854; the property unassessed in 1855; assessments by John Merriman from 1856 to· 1863 for 320 acres, and by William Smith, agent for John Merriman, in 1864, with property unassessed from said date to 1871, inclusive. There was a rendition by C. L. Bonville in 1872 and 1874, and by Mrs. Ella Bonville, by J. E. B. Laird, in 1875, with no record in 1876; and in 1877 the rendition of 100 acres by Frank Byerly and 200 acres by William McF. Lewis; in 1878 the records were destroyed; in 1879 Wm. McF. Lewis rendered 200 acres, and Frank Byerly 120;' in 1881 A. M. Rogers rendered 200 acres, as he did in 1882, 1885, 1886, 1888, 1889, and 1890; in 1891, 1892, 1893, 1894, 1895, 1896, 1897, 1898, 1900, 1901, 1902, 1903, 1904, 1905, and 1906, A. E. Smith rendered 200 acres in said survey; in 1907, 1908, and 1909 Orange Sawmill Company rendered 200 acres; and in 1915, 1920, 1921, 1922 Miller-Vidor Lumber Company rendered said property.

"It was shown by said assessments that at no time since 1877, the date of the deed to Frank Byerly above mentioned, in which Mrs. Bonville referred to the tract of land sold to Wm. McF. Lewis, until the present, have the plaintiffs or those under whom they claim, render any part of the land in controversy."

On July 19, 1880, A. M. Rogers was appointed guardian of the estate of the minors, Flavia and Adeline Bonville, by the county court of Orange county.

On March 3, 1875, Sarah Josephine Neyland, minor, by her next friend, filed suit in the district court of Orange county, Tex., against Mrs. Mary Ellen Bonville, alleging that she and Mrs. Bonville were the only heirs at law of Sarah and John Merriman, both deceased, and as such each of them inherited' a one-half interest in all the estate of the deceased Merrimans, which she described in her petition, naming therein the James Enner survey of 320 acres,·and prayed for partition. She alleged further that Mrs.· Bonville had ousted her from possession of the estate and was deadening, cutting, felling, and removing valuable pine timber, to her damage $2,500. On July 19, 1875, Sarah Josephine Neyland filed a supplemental petition, suggesting the death of C. L. Bonville, the husband of Mary E. Bonville, and making their two minor children, Flavia and Adeline Bonville, parties defendant, praying for the appointment of a guardian for the minors, and for judgment as in her original petition. On September 8, 1876, Sarah J. Neyland filed another petition in this same case, naming as defendants Sock Addison, Mary Addison, Flavia Bonville, and Adeline Bonville, charging them with cutting, wast-, ing, and removing valuable pine timber from the lands described in her original petition, and prayed for an injunction restraining them from such conduct pending the disposition of the original suit on its merits. At the ·December term, 1875, in this suit instituted by Sarah J. Neyland, the district court entered an order revoking the appointment of Mrs. Bonville as special guardian for the two minors named in that suit, and appointed William McFarlane Lewis, directing him to give bond in the sum of $1,000, and continuing the case until the next term of court. On December 20, 1876, final judgment was entered in the Sarah J. Neyland suit by agreement. This suit was styled on the docket:

"Sarah J. Neyland, by her Next Friend, A. A. Neyland, v. Mary Ella Province, P. P. Province, and Flavia and Addie Bonville, and Wm. McF. Lewis. No. 401."

By this agreed judgment certain lands were awarded to the plaintiff, Sarah J. Neyland, divesting title out of the Bonvilles and vesting it in the plaintiff. Other lands, including the James Enner survey, were given to Mary Ellen Province and her two children, divesting the title to this land out of the plaintiff and vesting it in Mary Ellen Province and her two children. The judgment further recited that John Jackson was attorney ad litem for the minor heirs, Flavia and Adeline Bonville, and the minors were taxed with $20 as a fee for the said John Jackson. William McFarlane Lewis was not named in

the judgment, except in the style of the cause as given above, and there was no express adjudication of his interest by the judgment. There was no evidence of his interest in the suit, no explanation as to why he was a party. The judgment in the Neyland Case was originally offered by appellees. Appellant also offered this judgment "for the purpose of showing that John H. Jackson was the party appointed as guardian ad litem, and that he' was allowed a fee for that purpose and for the purpose of showing that William McFarlane Lewis was not named in the judgment, except in the title of the cause, but he is not disposed of, either as plaintiff or defendant."

By deed dated January 17, 1876, Mary E. Bonville deeded to Frank Byerly the following described tract of land out of the James Enner survey:

"Beginning at the northwest corner of the James Enna survey. Thence east on said Enna north boundary line to the survey made for Wm. F. McLewis on said Enna survey to the said McLewis west boundary line coming with the said Lewis northwest corner for the first corner. Thence south on said McF. Lewis west line to his, McLewis', southwest corner for second corner. Thence west on the south line of the James Enna survey to the southwest corner of said Enna survey for the third corner. Thence north on said Enna west line to the place of beginning for fourth corner, containing one hundred acres, more or less."

From the statement we have made, we deduce the following conclusions:

(1) In support of appellees' title: (a) They hold the record title originating in the James Enner 320-acre certificate; (b) an active claim under this title from its origin to 1877, with reasonable regularity in the payment of taxes up to and inclusive of 1875.

(2) In support of appellant's title: (a) A regular chain of transfers from the conveyance by Lewis to Rogers in 1883 into appellants, with rendition and payment of taxes by the holder of this title from and inclusive of 1877 to the filing of this suit, with only occasional delinquencies, but a due recognition of the tax obligation and full payment; (b) recognition by Mrs. Bonville in her deed to Byerly in 1876 of the Lewis claim to the Enner land; (c) an active claim by Lewis and sale by him of timber on this land in 1876, followed by suit upon the notes given, in consideration of the sale, attachment of timber, and an order of foreclosure on the attachment lien; (d) an active claim by Lewis to the timber subsequent to 1876, shown by cutting it, a general reputation as to its ownership, and a claim of ownership made by him to those cutting the timber, while they were engaged in cutting it; (e) a continuation of this claim, with rendition and payment of taxes until this burden was assumed by Rogers, to whom Lewis conveyed the land in 1883; (f) an active claim by Rogers, evidenced by cutting timber on the land, payment of taxes, claims of ownership made by him to those cutting the timber, and general reputation; (g) a continuation of this claim by the holders of the Lewis title until the filing of this suit; (h) the appointment of Rogers as guardian of the two Bonville minor children in 1880, and his personal claim against his wards; (i) a complete nonclaim by Mrs. Province from 1877 to her death about 1902; a nonclaim by Adeline Bonville, one of the grantees in the deed of 1877 during her entire life of 50 years; a nonclaim by Mrs. Schreiber, also one of the grantees in the 1877 deed, up to a short while before the filing of this suit; a nonclaim on the part of the other appellees and other grantee in the 1877 deed up to the filing of this suit. Though Mrs. Schreiber was born and had lived in Orange county, where this land was situated, all her life, and said she knew of this land and her claim to it, her nonclaim was so pronounced that she did not know that the railroad had been built across it; that the timber had been cut off; that others were in occasional possession, paying taxes thereon and borrowing money thereon. The nonclaim by this appellee and the two Bonville children was as complete from 1877 as if of that date they had been divested of all right, title, claim, and interest in and to the land. Beyond the possibility of a doubt, these facts and circumstances raise the issue of the presumption of a grant into Lewis. The last statement that has been called to our attention of the rule for presuming a grant was by the Chief Justice of the Galveston Court of Civil Appeals in Fowler v. Texas Exploration Co. (Tex. Civ. App.) 290 S. W. 818, where he said:

"Where title has been openly and notoriously asserted as against heirs of one who held title in his lifetime and who must have known of adverse claim and assertion of title, court or jury is authorized to find that such title had passed by deed or otherwise from ancestor, and evidence need not conclusively establish that grant was made, but need only lead to conclusion that conveyance might have been executed."

A writ of error was denied in that case. Now, weighing the facts of this case by the rule announced, we find that "title has been openly and notoriously asserted" (for almost 50 years) "as against heirs of one who held title in his lifetime (C. L. Bonville, who died in 1875 or 1876, Mrs. Bonville Province, who died in 1901 or 1902, her husband, P. P. Province, who died possibly in 1877, Adeline Province, who died about 1915, and Flavia Bonville, the date of whose death is not shown), "and who must have known of the adverse claim and assertion of title" (although Mrs. Schreiber denied that she knew of the adverse claim, its assertion was so notorious that in law she was visited with notice, and

even as a jury issue a finding that she did not have actual notice would have been against the great weight of the evidence). On that conclusion, Judge Pleasants said:

"Court or jury is authorized to find that such title had passed by deed or otherwise from ancestor."

And he further says:

"Evidence need not conclusively establish that grant was made, but need only lead to conclusion that conveyance might have been executed."

All the circumstances named are consistent with the grant, and none of them are inconsistent with the grant. The execution of the grant explains the nonclaim by appellees and those under whom they hold and the active claim by appellant and those under whom it holds. A further quotation from the Fowler Case makes certain our conclusion that the circumstances we have given raised a jury issue in appellant's favor:

"The salutary rule which authorizes a court or jury to find when a title has been openly and notoriously asserted for a long period of time, as against the heirs of one who held the title in his lifetime and must have known of the adverse claim and assertion of title, and such continuous adverse claim and active assertion of ownership is known and long acquiesced in by the heirs, that such title had passed by deed or otherwise from their ancestor, is a settled rule of decision in this state. The rule is generally referred to as the presumption of a deed or grant, but it seems to us it could be more accurately termed proof of title by circumstantial evidence. The rule has been given the most liberal interpretation and application by our courts. The following quotation from the case of Frugia v. Trueheart, 48 Tex. Civ. App. 513, 106 S. W. 742, shows the extent of its application:

" 'The law further is that, where the fact or deed, as the case may be, which is sought to be presumed, lies back 30 or more years, and the parties claiming the presumption, or those whose estate they have, or both combined, have during such period openly and notoriously, and with the acquiescence of their adversaries, claimed and exercised acts of ownership over the land in question, such as might reasonably be expected from owners thereof, and the circumstances in evidence, taken in their entirety, are consistent with the presumption sought to be indulged, and it is more reasonably probable that the facts sought to be presumed existed than that they did not, then the jury are at liberty to presume them and find accordingly.' "

Appellees recognize the force of circumstances relied upon by appellant, and, reviewing the judgment in Lewis v. Skinner Gifford & Co., say:

"This is a circumstance showing that in 1876 Lewis was claiming some of the timber on the James Enner survey. Therefore the recitation in the deed to Byerly concerning the survey made to Lewis on the Enner survey is cleared

298 S.W.—11

up and satisfactorily explained when we consider this judgment. Neither the deed to Byerly nor this judgment recite that Lewis owned any land in the Enner survey, but the effect of it is that he owned some timber. Now it is probable, especially in view of the other facts in this case, that Lewis purchased the timber, and that it was surveyed to him. This is the only explanation that can be adopted which will harmonize the case."

[2-4] The explanation of appellees does not follow as a matter of law. Mrs. Bonville did not refer to the Lewis claim in her Byerly deed as a timber claim, but as "a survey made for Wm F. McLewis on said Enner survey." Here it should be said that in some parts of the record this grantee is referred to as Wm. McFarlane Lewis, and again as Wm F. McLewis. It is clear, though, from the record as a whole, that his name was Wm. McFarlane Lewis. But apart from this explanation or recitation in the Byerly deed, appellees say the legal effect of the circumstances relied upon by appellant was nullified and destroyed by the following circumstances reflected in our statement of the case:

(a) One of appellant's witnesses testified that Lewis told him he acquired his title to the Enner survey from Capt. Bill Smith or Judge Smith. The argument is that a presumption can be indulged only in aid of appellant's title and not against the title shown; that, having shown the origin of its title in Smith, it cannot trace its title to the Bonvilles. This testimony was only a circumstance for the jury. Appellant showed by the deed from Mrs. Bonville to Byerly her recognition of a "survey made for McLewis." A proper inference from this written statement by Mrs. Bonville is that the Lewis claim emanated from the regular chain of title. Then the credibility of the witness on this issue was for the jury. He was testifying as to a conversation he had had with Lewis 50 years before, and its weight did not follow as a matter of law. This circumstance did not work an estoppel against appellant to claim the grant direct to Lewis. But, had the evidence shown conclusively that Lewis held under Smith, the same chain of circumstances that supports a grant from the Bonvilles to Lewis would also support a grant from them to Smith and from Smith to Lewis. Again, the reference to Smith was in general terms, and it was for the jury to say whether Lewis was holding the land in controversy, or other lands under Smith.

[5, 6] (b) Appellees advance the proposition that the judgment in the suit of Sarah Josephine Neyland v. The Bonvilles was both an estoppel and res adjudicata against Lewis' claim to the land. This proposition is not sound. No issue was involved between Lewis and the Bonvilles. The judgment was by agreement. If Lewis held a grant from the Bonvilles, this judgment awarding the title to

them was for his benefit. It appeared from the pleadings that the title asserted by Sarah Josephine Neyland was outstanding when the grant to Lewis was made, if, in fact, he had such a grant, and the acquisition of this title by the Bonvilles, whether by deed or judgment, brought it within the general rule that a grantor acquiring outstanding title, must hold it for his grantee.

[7, 8] By argument filed since the submission of this case, appellant seeks to explain Lewis' appearance in the Neyland Case on the theory that he appeared as guardian for the Bonville minors, and on that issue advances the proposition that he was bound only in the capacity in which he appeared. We agree with appellees that appellant took the position on the trial of this case that Lewis did not appear in that case as such guardian, and therefore it follows that it is estopped to do so now. A party cannot take one position before the trial court, try his case on that theory, and then on appeal take a contrary position. Temple Lumber Co. v. Pulliam (Tex. Civ. App.) 272 S. W. 590.

[9] (c) Since 1877, following the rendition of the judgment in the Neyland Case in 1876, Mrs. Province attempted to convey the land in controversy to her three minor children, under whom appellees hold, they say that no presumption can arise that the Bonvilles had made a prior deed to Lewis. Again, discussing the presumption of a grant as against this deed to the minor children, appellees say: "Presumption is only indulged where there is no deed out of the grantor." This deed by Mrs. Bonville Province to her children is only a circumstance for the jury. The record shows affirmatively that she deeded 100 acres of this land to Byerly, and that he claimed this land by paying taxes thereon for several years. Yet this land was included in her conveyance to her children. On this showing, no presumption of law arises that a part of the land had not previously been sold to Lewis.

(d) Appellees say that they are innocent purchasers of the land under the deed to them from their mother. This proposition does not require us to determine the sufficiency of that deed, since none of the elements of an innocent purchaser are shown.

Appellant says the court erred in not instructing a verdict in its favor. This proposition is not sound. Clearly, on the facts of this case, no presumption of law arises that Lewis had acquired the Bonville title.

[10] Both parties in this case filed motions for instructed verdict. Appellees' motion, as we have shown, was granted, but appellant's motion denied. Appellant filed the following exceptions to the court's charge:

"Defendant was entitled to a peremptory instruction instead of plaintiffs.

"The question of the presumption of a grant was raised by the evidence, and was an issue of fact for the jury.

"The court erred in giving a peremptory instruction for the plaintiffs.

"Said charge is upon the weight of the evidence and against the great weight and preponderance of the evidence."

On these facts, appellees advance the following proposition:

"Where the suit of Florence Schreiber et al. v. W. H. Stark et al., to recover 320 acres of land, being a part of the James Enner survey, was tried by the jury and at conclusion of evidence both parties requested instructed verdict in their behalf, the parties are regarded as waiving a jury and approving testimony by each in their favor, thus electing to take action of court as final, and neither can be heard to complain of court's action resolving any issue against them or in failing to submit issue to jury where this was not requested."

Tiblier v. Perez (Tex. Civ. App.) 277 S. W. 189, seems to support that proposition. On certain grounds of distinction, the Fort Worth Court of Civil Appeals refused to follow that case in Hill v. Stampfli, 284 S. W. 239. The fact that appellant here excepted to the special charge, as shown, may distinguish this case from the Perez Case. We think the distinction is as potent as that recognized in the Hill Case. But we do not rest our disposition of the proposition on that distinction. Under the statutes of our state, appellant had a right to a jury submission on all issues in its favor (Harlington Land & Water Co. v. Houston Motor Car Co. [Tex. Com. App.] 209 S. W. 145), and, as issues were raised in its favor, the peremptory instruction was error. There is nothing in our statute depriving one party of a jury because his adversary also moves, as he did, for an instructed verdict. Under our statute, fully discussed in the Houston Motor Car Company Case, supra, each party has the right to take such steps as he deems necessary to protect his interest, untrammeled by any action on the part of his adversary.

[11] District Judge V. H. Stark is a brother of one of the original defendants, W. H. Stark, and at the inception of the case held himself disqualified. While the case was pending on the docket, a special judge qualified to hear the case called it for orders, whereupon defendant W. H. Stark was formally dismissed from the case, without objection or exception by any one, and his interests were in no way further litigated. When the case was called for trial at a subsequent term, Judge Stark proceeded to hear it, overruling the suggestion of his disqualification made by appellant. One of the assignments on this appeal suggests that Judge Stark erred in refusing to hold himself disqualified. This assignment is without merit. When W. H. Stark was dismissed from this case, under the conditions stated, the case stood for trial as though he had never been a party.

[12] The following is a copy of the written transfer of the land certificate by James Enner of James Walea, dated June 29, 1842, and duly acknowledged:

"Republic of Texas, County of Jefferson.

"Know all men by these presents, that I, James Enner, of the county and republic aforesaid, have made and appointed James Walea my true and lawful attorney for me and in my name giving him full power and authority in my name to obtain demand and receive the title for 320 acres of land by virtue of my own headright certificate No. 17 issued by the board land commissioners for the county of Jefferson. I further authorize and empower my said attorney to use all lawful ways and means to obtain, receive, and complete the title to himself, his heirs, assigns, and legal representatives forever hereby relinquishing to him all the right power vested in me respecting said land. I further authorize and empower him my said attorney to appoint one or more attorneys under him to demand and receive the patent for said land from the commissioner of the General Land Office and to use all ways and means in accordance with all the laws now or that may hereafter be in existence respecting completing and obtaining patents or titles to land. In testimony whereof I have hereunto interchangeably my hand seal this 29th day of June, 1842.

　　　　　　　"James Enner. [Seal.]

"Signed and delivered in the presence of Nathan Hallett & James Jett.

　　　"Nathan Hallett.
　　　"James Jett."

When offered, appellant made the following objection to this instrument:

"For the reason that the same was a mere power of attorney and not being a transfer of certificate and not having had that effect, and not having been recognized by the land office of Texas, inasmuch as the title and patent to the land was not issued to James Walea, but was issued to Enner, and because same is an instrument in the form of a power of attorney and does not convey the title; and the said objections, having been duly made and presented, were then and there overruled by the court, and the said instrument was introduced in evidence and considered by the court on the trial of this cause, to which action of the court the defendant then and there accepted and now tenders this its bill of exceptions thereto, and asks that the same be allowed, approved, and made a part of this record."

Instruments of identically the same legal effect have been construed by our courts as transfers of the certificates. Davidson v. Senior, 3 Tex. Civ. App. 547, 23 S. W. 24; Brown v. Simpson's Heirs, 67 Tex. 225, 2 S. W. 644; Cook v. Lindsey, 57 Tex. 67. We can add nothing to the arguments advanced in the cited cases, and on their authority appellant's assignment is overruled.

[13, 14] For the purposes of appellant's proposition, we concede without quoting it that the acknowledgment of Mrs. Mary E. Myres to the deed by her and her husband to James Walea was fatally defective, and therefore void as to any separate interest she may have had in the lands conveyed. But the conveyance by Walea to Myres, the husband, made the property presumptively community, and there was nothing shown to rebut that presumption. The execution of the deed by the husband alone was sufficient to transfer the title back to Walea, and therefore the sufficiency of the wife's acknowledgment is an immaterial issue. Scott v. Maynard, Dallam's Dig. 548; Purdom v. Boyd, 82 Tex. 130, 17 S. W. 606; Moody v. Smoot, 78 Tex. 119, 14 S. W. 285; Green v. Ferguson, 62 Tex. 525; KinKaid v. Lee, 54 Tex. Civ. App. 622, 119 S. W. 342; Lynch v. Lynch (Tex. Civ. App.) 130 S. W. 461; Duncan v. Bickford, 83 Tex. 322, 18 S. W. 598; Booth v. Clark, 34 Tex. Civ. App. 315, 78 S. W. 392; Rhodes v. Alexander, 19 Tex. Civ. App. 552, 47 S. W. 754; Laufer v. Powell, 30 Tex. Civ. App. 604, 71 S. W. 549; King v. Holden (Tex. Sup.) 16 S. W. 898; Welborne v. Downing, 73 Tex. 527, 11 S. W. 501.

[15, 16] The deed executed in 1877 by Mary Ellen Province to her three minor children, purported to have been executed by Mary Ellen Province, joined by her husband, P. P. Province, and was executed, "M. E. Province, P. P. Province, by M. E. Province," and acknowledged as follows:

"State of Texas, Orange County.

"Before me, R. H. Smith, county clerk of said county, personally came Mary Ella Province, to me well known, and acknowledged to me that she signed and executed the above and hereto attached deed for herself and as agent for her husband, P. P. Province, for the purposes and considerations therein contained. And the said Mary Ella, upon a private examination by me separate and apart from her husband, and having said deed read and explained to her, declared to me that she executed the same for her own free will and accord, without fear or coercion of her said husband, and that she did not wish to retract it.

"To which I certify under my hand and seal of office, at Orange, this June 8, 1877.

　　　"R. H. Smith, Co. Clerk Orange County."

When offered by appellees, appellant objected—

"on the ground that the husband of the married woman did not join in the conveyance, but his signature purports to be made to the instrument by her, as his agent, she having signed for herself and as agent for her husband; and the said objections, having been duly made and presented, were then and there overruled by the court on the trial of this cause, to which action of the court the plaintiffs then and there excepted, and now tender this their bill of exceptions thereto and ask that same be allowed, approved, and made a part of this record."

There was no proof of the agency under which Mrs. Province undertook to execute this deed on the part of her husband. If, because of the statement in the acknowledgment and the age of the instrument, an inference arises of the existence of the power named in the

certificate, which point we do not decide, then the deed was sufficient. KinKaid v. Lee, 54 Tex. Civ. App. 622, 119 S. W. 342; Jones' Estate v. Neal, 44 Tex. Civ. App. 412, 98 S. W. 417, and cases cited on page 428 thereof. But it is not necessary for us to determine whether such a presumption can be drawn from the face of this deed. The record shows that P. P. Province and Mary Ellen Province died without making any other conveyance of this land, and therefore appellees hold their title as heirs, and it is not necessary for them to show a valid deed from the Provinces.

[17-19] W. H. Stark, as a defendant, did not claim any interest in the land in controversy between appellant and appellees. After he was dismissed from the suit he executed a quitclaim deed conveying to appellees the land for which he was sued. After the execution of this deed, appellees filed no pleadings in the case, nor amended their old pleadings. Appellant objected to the reception of this deed on the ground that no pleadings had been filed to authorize its introduction. If this deed had been offered as a muniment of title, the objection would have been good. A title acquired subsequent to the alleged ouster is not admissible. Collins v. Ballow, 72 Tex. 330, 10 S. W. 248, Andrus v. Hutchinson (C. C. A.) 17 F.(2d) 472, a Texas case. But it was not a link in appellees' chain of title as between them and appellant. It had the effect only of showing that W. H. Stark was not claiming any of the Enner survey as against appellees. Possibly this deed was irrelevant to any issue before the jury, and we think it was, but its introduction was not reversible error, under rule 62a. Martin v. Parker, 26 Tex. 254.

While not relevant to any issue before the jury, it can be looked to by us in support of our ruling above on the qualification of Judge V. H. Stark to try the case.

[20-23] On the issue of presumption of a grant to William McFarlane Lewis, appellant complains of the exclusion by the court of evidence to show that (a) the land was generally known in the community as belonging to Lewis; (b) Lewis was a man of good reputation; (c) Lewis claimed the land under Mrs. Bonville; and (d) defendants secured an opinion on the title before purchasing. Evidence that the land was generally known in the community as belonging to Lewis was admissible on the issue of the presumption of a grant. J. M. Guffey Petroleum Co. v. Hooks, 47 Tex. Civ. App. 560, 106 S. W. 695; Carlisle v. Gibbs, 57 Tex. Civ. App. 592, 123 S. W. 216. But, as we understand the testimony of the witness Lyons on this issue, the court received his evidence. He testified, "It was the general opinion that Mac Lewis owned the swamp lands;" which we construe as referring to the Enner lands. The court did not err in excluding the testimony as to Lewis'

general reputation for honesty and fair dealing. On the issue of presumption of a grant, this character of testimony has no probative force whatever. Niles v. Houston Oil Co. (Tex. Civ. App.) 288 S. W. 619. Evidence that Lewis claimed the land under Mrs. Bonville would have been admissible, but, as we understand the bill of exceptions brought forward by appellant and upon which it bases its proposition, the evidence offered did not have that effect. That defendants secured an opinion on the title to the land before purchasing was irrelevant, immaterial, and self-serving, and hence properly excluded. Shifflet v. Morelle, 68 Tex. 382, 4 S. W. 843.

For the error committed by the court in instructing a verdict in favor of appellees, the judgment of the trial court is reversed, and this cause remanded for a new trial.